**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MARIO TRICOCI HAIR SALONS &
DAY SPAS, LLC d/b/a Tricoci Salon and
Spa, an Illinois corporation,

     Plaintiff,

     v.

CLAUDIA POCCIA and MOLLY SLOAT,

     Defendants

Case No. 20-cv-07196

Honorable Judge Matthew F.
Kennelly

Honorable Magistrate Judge
Gabriel A. Fuentes

**DEFENDANT CLAUDIA POCCIA'S OPPOSITION TO PLAINTIFF'S AMENDED
MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................... 5

  A.   Tricoci Retains Ms. Poccia Because of her Decades of Industry Experience. ................... 5

  B.   Ms. Poccia's Consulting Agreement .................................................................. 6

  C.   Tricoci Breaches Ms. Poccia's Consulting Agreement. ...................................... 8

  D.   Ms. Poccia's work with Ideavation and Fekkai ................................................ 10

    1.   Tricoci's Baseless Reliance on Non-Confidential or False Documents to Support Its Contractual and Trade Secret Theories .......................................................... 12

    2.   Tricoci's Unsupported Reliance on Innuendo. .............................................. 15

III. ARGUMENT .................................................................................................... 16

  A.   Tricoci Is Unlikely to Succeed on The Merits. ................................................. 16

    1.   Tricoci's Spurious Request That the Court Issue a Worldwide Non-Compete Based on Non-Existent or Non-Confidential Documents Must Be Rejected ................................. 16

    2.   Tricoci Otherwise Fails to Demonstrate Any Violation of the ITSA or DTSA. .............. 20

  B.   Ms. Poccia Did Not Violate the Consulting Agreement as a Matter of Fact and Law. ...... 22

    1.   Tricoci Will Not Suffer Irreparable Harm and Does Not Lack an Adequate Remedy at Law ......................................................................................................... 24

    2.   The Balance of Hardships and Public Interest Supports Denying the Preliminary Injunction Motion ................................................................................. 24

IV.  CONCLUSION ................................................................................................ 25

i.

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*90 Inc. v. Weldcote Metals, Inc.*,
    364 F. Supp. 3d 888 (N.D. Ill. 2019) ............................................................20, 21

*Allied Waste Servs. of N. Am., LLC v. Tibble*,
    177 F. Supp. 3d 1103 (N.D. Ill. Apr. 7, 2016) ........................................20

*AssuredPartners, Inc. v. Schmitt*,
    44 N.E.3d 463 (Ill. Ct. App. 2015) ........................................................22

*Cintas Corp. v. Perry*,
    No. 03 C 8404, 2004 WL 2032124 (N.D. Ill. Aug. 20, 2004)................19

*CMBB LLC v. Lockwood Mfg., Inc.*,
    628 F. Supp. 2d 881 (N.D. Ill. 2009) .....................................................21

*Meade Elec. Co. v. Wicks*,
    No. 1-09-2933, 2011 WL 9933759 (Ill. App. Ct. May 9, 2011) ............21

*Meridian Mut. Ins. Co. v. Median Ins. Group*,
    128 F.3d 111 (7th Cir. 1997) ..................................................................24

*Packaging Corp. of Am., Inc. v. Croner*,
    419 F. Supp. 3d 1059 (N.D. Ill. 2020) .......................................17, 18, 21

*PepsiCo, Inc. v. Redmond*,
    54 F.3d 1262 (7th Cir. 1995) .....................................................18, 19, 20

*Quixote Transp. Safety, Inc. v. Cooper*,
    No. 03 C 1401, 2004 WL 528011 (N.D. Ill. Mar. 12, 2004)..................23

*Reliable Fire Equip. Co. v. Arredondo*,
    965 N.E.2d 393 (Ill. Ct. App. 2011) ......................................................22

*Right Field Rooftops, LLC v. Chicago Baseball Holdings*, LLC,
    87 F. Supp. 3d 874 (N.D. Ill. 2015) .......................................................24

*Rubloff Dev. Grp., Inc., v. SuperValu, Inc.*,
    863 F. Supp. 2d 743 (N.D. Ill. 2012) .....................................................22

*Triumph Packaging Grp. v. Ward*,
    834 F. Supp. 2d 796 (N.D. Ill. 2011) ...............................................17, 20

*Turnell v. CentiMark Corp.*,
  796 F.3d 656 (7th Cir. 2015) ...................................................................................................16

*Weber Shandwick Worldwide v. Reid*,
  2005 WL 1651030 (N.D. Ill. May 12, 2005) ...........................................................................24

**Statutes**

18 U.S.C. § 1836(b)(3)(D)............................................................................................................4

## I.    <u>INTRODUCTION</u>

For 35 years, Defendant Claudia Poccia has worked in the beauty industry. Among other roles, she was the Chief Executive Officer for Laura Mercier, Chief Marketing officer for BareMinerals, President of Avon Products, Inc. U.S. Beauty, and founder of Dragonfly Sage, a consultancy business for lifestyle and beauty brands throughout the United States. She specializes in reinvigorating brands and products to make them viable for broader distribution to target audiences. Plaintiff Tricoci—a regional hair salon and spa company, with no locations and limited product sales outside the Chicago metropolitan area—retained Ms. Poccia with the goal of leveraging her industry expertise to reformulate and improve Tricoci's outdated hair products. Ms. Poccia was never an employee of Tricoci.  Rather, Ms. Poccia agreed to a limited independent contractor arrangement with Tricoci, which lasted from February 2019 until late March 2020. At that time, Tricoci violated the 30-day notice provision of the consultancy arrangement by terminating Ms. Poccia's agreement, citing internal financial concerns. Tricoci also paused its product rebrand projects. Ms. Poccia now works for Fekkai, a hair and beauty products company whose primary business has for years involved national retail sales and e-commerce, and which Tricoci falsely claims is its direct competitor.

Through its Motion for Preliminary Injunction (the "Motion"), Tricoci asks the Court to enjoin Ms. Poccia "from working for Fekkai, Fekkai-affiliate entities, or any other direct competitor *until such time as Tricoci's confidential and trade secret information [Ms. Poccia] acquired no longer has value*." (ECF No. 58 (emphasis added).) Tricoci does not ask the Court to enforce Ms. Poccia's actual non-compete obligation, as she has not violated any non-compete obligation. Tricoci instead relies on an overly broad and unenforceable confidentiality clause in Ms. Poccia's consulting agreement, the inevitable disclosure doctrine, and disingenuous claims of

trade secret violations in seeking to impose an indefinite, worldwide non-compete preventing Ms. Poccia from working in her profession of nearly 35 years. Put differently, Tricoci asks this Court to impose facially unenforceable non-compete obligations on someone who worked as an independent contractor on behalf of a local hair salon company for just 13 months. Tricoci's efforts should not be countenanced.

*First*, the only allegations of trade secret misappropriation are facially spurious and potentially worse. After six months of litigation and Ms. Poccia's production of over 16,000 e-mails and electronic files, Tricoci cites just five documents, all dating back over two years and three of which Tricoci has no evidence were ever used or disclosed:

- **False SantaCroce-Poccia Email (Tricoci Exhibit 64).** Tricoci asks the Court to rely on a document purporting to show Fekkai Controller Joseph SantaCroce sending Ms. Poccia a Tricoci document entitled "December 2019 S&OP Meeting see slide 7 Mario Product." As Tricoci and its counsel knew or should have known, this document does not exist. Tricoci Exhibit 64 is a corrupted file fragment which, in the file carving process, merged two or possibly three documents together. The ESI vendor, selected by Tricoci, provides a declaration to this opposition stating that **Exhibit 64 "does not accurately depict the content of the original email that Claudia Poccia received from the sender."** (Spore Decl. ¶ 10.) Mr. SantaCroce also provides a declaration under oath with a true and correct copy of the actual e-mail and the attachment sent by Ms. Poccia. The true attachment contains information only pertaining to Fekkai.[1]

- **Segmentation Branding School Project Report**. In a particularly egregious example underscoring the dishonesty of Tricoci's theories, Tricoci ominously refers to a "Segmentation Branding Report" it has never seen but assures the Court is a spreadsheet mentioning both "Tricoci" and "Fekkai." Attached as Poccia Exhibit B is the report; it is a school project prepared by a Tricoci approved intern on branding in the toothpaste industry; *it has absolutely nothing to do with any issues in this case*. (Poccia Ex. B.)

- **MT 2019 Deck (Tricoci Exhibit 17).** Ms. Poccia sent a document to her friend and business partner Joanna Coles in March 2019 containing entirely public

---

[1] Evidence suggests Tricoci Exhibit 64 was created for presentation to this Court by printing merged fragments of a data extraction to PDF through a Relativity viewer feature not used when generating a regular production. In other words, a reviewer would have had to actually manipulate information to generate this document and it does not appear to have been produced in discovery. Ms. Poccia reserves all rights with respect to this issue.

information gathered from market research firm NPD and otherwise based on Ms. Poccia's own industry experience and knowledge. Ms. Poccia sent this as a template example for a pitch document, not for any competitive purpose.

- **Ideavation Deck.** In another instance, Ms. Poccia circulated a pitch deck for a non-competitive business proposal that Tricoci has never seen, but which Tricoci still claims supports its injunction request.  It contains absolutely no Tricoci information whatsoever (Poccia Decl. ¶ 39.)

- **Tricoci Magazine.** Tricoci next cites an unpublished magazine sent to Ms. Poccia, a magazine packaged four days following Ms. Poccia's receipt and published a few weeks thereafter. Tricoci assumes Ms. Poccia disseminated the magazine to a handful of investors in September 2019 but admits it has no evidence to support this assumption.

Having put forth false evidence and failing to allege any actual theft or misuse of trade secrets, Tricoci turns to the inevitable disclosure doctrine to keep Ms. Poccia indefinitely from a job in her established industry of more than 35 years. As an initial matter, Tricoci and Fekkai are not competitors. Fekkai's business is based almost entirely on selling innovative products in large distribution chains across the United States, which it has done for at least a decade. In contrast, Tricoci, is primarily a regional Chicago-based hair salon with no national presence beyond its website. By its own admission, just two years ago, it began developing products that may feasibly be distributed to retailers outside the Chicago metro in 2019 but it paused this work in March 2020 due to the COVID pandemic. For just thirteen months, Ms. Poccia provided consulting services for Tricoci, helping to develop a specific product line. At Fekkai, she is a Board Member and the acting Chief Executive Officer, overseeing every aspect of the business, far exceeding her narrow duties with Tricoci (*See* Poccia Decl. ¶¶ 6-11; 24-26.)

*Third*, as noted above, Tricoci asks this Court to enforce a confidentiality provision in an independent contractor agreement without any durational or geographic limit. Quite literally, Tricoci seeks to bar Ms. Poccia from working in the beauty industry, where she has worked for the past 35-years, in perpetuity, anywhere in the world, even when such work would not violate

her actual non-compete covenant with Tricoci. Besides being unreasonable, the confidentiality provision is unenforceable against Ms. Poccia based on Tricoci's material breach of the Consulting Agreement when it termed the relationship without notice and without paying Ms. Poccia the amount owed to her under the Consulting Agreement.

*Fourth*, at bottom, the "trade secret" information Ms. Poccia allegedly misappropriated is over two years old, and despite the significant amount of time that has passed, Tricoci cannot show that is has sustained any damage from Ms. Poccia's alleged misappropriation or her work with Fekkai. Nonetheless, Ms. Poccia has made clear to Tricoci that to preserve court and litigant resources, she is willing to enter into an agreed injunction (without admission of liability or waiving any defenses to the enforceability of the restrictive covenants) promising she will not use or disclose any Tricoci confidential information or trade secrets or solicit any Tricoci employees. As a part of this filing, Ms. Poccia will be submitting a proposed order on a stipulated preliminary injunction to this Court. Tricoci has insisted to this point that it will not accept anything short of preventing Ms. Poccia from working in at least some aspects of the haircare industry. On these facts, that is simply untenable. Respectfully, Tricoci's unwillingness to agree to reasonable stipulated terms reveals its desire to weaponize trade secret and contract law by creating an end-run around public policy against unfair restraints on trade. The Court should reject Tricoci's injunction requests in full, and Ms. Poccia reserves all rights under 18 U.S.C. § 1836(b)(3)(D).

Tricoci's Motion should be rejected for several other reasons noted below. This includes its reliance on unsupported innuendo and "factual" statements to manufacture a false impression of Ms. Poccia's personal and business relationships in her short stint with Tricoci. For all reasons set forth below, the Court should deny this motion in full.

4

## II.     FACTUAL BACKGROUND

### A.     Tricoci Retains Ms. Poccia Because of her Decades of Industry Experience.

Ms. Poccia has been in the beauty industry for over 35 years. (Poccia Decl. ¶ 4.) In the last decade, she has spent her time working in executive roles or advising executives through her consultancy business on rebranding, recrafting, and enhancing beauty product lines so they have greater appeal to target audiences, thereby improving sales and product distribution. (*Id.* ¶¶ 5-12.) Between 2015 and 2016, Ms. Poccia worked as an executive consultant advising executives corporate officers and entrepreneurs on long-range strategic planning, marketing, product development, and product distribution. (*Id.* ¶ 7.) She then served as the Chief Marketing Officer and International Business Development lead for BareMinerals, a globally distributed skincare company marketing botanical skin products free from unnecessary chemicals and additives. (*Id.* ¶ 8.) Ms. Poccia left BareMinerals in the February 2018 and then worked as an executive consultant for luxury and beauty lines through her new consulting business, Dragonfly Sage.  (*Id.* ¶¶ 9-10.)

In November 2018, an executive recruiter contacted Ms. Poccia regarding Tricoci's search for a Chief Executive Officer to lead the reinvigoration of the Tricoci business with a focus on the reformulation and marketing of a new line of Tricoci haircare products. (Poccia Decl. ¶ 13.) Ms. Poccia interviewed with the Tricoci family and Blue Road Ventures Managing Partner Chris Santiago to discuss a possible business relationship that would leverage Ms. Poccia's decades-long experience marketing and generating brand recognition in various beauty businesses. (*Id.*) At this time, Tricoci did not own its own haircare product formulas, instead largely selling "off-the-shelf" formulas packaged in Tricoci branding. (*Id.* ¶ 14.) Tricoci's formulas also contained chemicals and additives that made them economically unviable for modern day distribution chain sales, which now feature and emphasize "clean" products using all-natural ingredients. (*Id.* ¶ 25.) Tricoci

5

did not have meaningful online sales, and sold its non-proprietary formulas and products exclusively in its salons and spas in the Chicago metro area. (*Id.* ¶ 15.)

After several conversations regarding the scope and nature of work, Ms. Poccia agreed to work with Tricoci as an independent contractor consultant. (*Id.* ¶ 16.) Through this arrangement, Ms. Poccia would devote her efforts toward upgrading the existing Tricoci-specific product line now called the "Tricoci Collection," and developing new products comprised of Tricoci-specific, chemical and additive free hair products. (Poccia Decl. ¶ 17.) During the relevant time, Ms. Poccia was (and still is) on the Board of Directors for Innospec which in part manufactures specialty chemicals for home and beauty products. (*Id.* ¶¶ 12, 16.) She was (and still is) also the Board Chairperson for Luxie, which manufacturers makeup brushes and accessories. (*Id.*) Tricoci was aware of both business relationships. (*Id.* ¶ 16.)

Ms. Poccia intentionally sought a contract term with Tricoci of a short duration for largely personal reasons. (*Id.* ¶ 18.) She does not reside in Chicago and has resided in the Connecticut area for over 20 years. (*Id.* ¶¶ 3, 16, 18.) She did not wish to uproot her family (including her husband, who had his own career, and family in the Connecticut area) unless she felt confident after a short initial relationship that Tricoci aligned with both her personal and career priorities. (Poccia Decl. ¶ 18.) Accordingly, she and Mr. Santiago agreed that her relationship with Tricoci would contractually terminate after 7 months and would thereafter be renewed on a monthly basis. (*Id.*)

**B.    Ms. Poccia's Consulting Agreement.**

On February 8, 2019, Ms. Poccia and Tricoci signed the independent contractor agreement (the "Consulting Agreement") governing the parties' contractual relationship through Ms. Poccia's short tenure. (Poccia Decl. ¶ 19, Ex. A.) Tricoci's Motion implicates four key provisions. *First*, Tricoci agreed to pay Ms. Poccia $30,000 per month for her services. (*Id.*) *Second*, the Consulting

Agreement would last from February 11, 2019 through and including August 11, 2019. After August 11, the Agreement would renew monthly until notice was provided under the terms of the Agreement. (*Id.*) *Third*, any termination of the Agreement required 30 days' written notice. (*Id.*)

*Fourth*, Section 9 of the Agreement contained a Confidentiality Covenant barring disclosure of "Confidential Information" that is "Confidential." (Poccia Decl. ¶ 21, Ex. A.) "Confidential" is defined as information that is "not generally available to the public." *Id.* Despite this specification, the Agreement goes on to delineate categories of "Confidential Information" definitionally known to the public, such as Tricoci's "website content." (*Id.*) Further, the definition is overbroad because it includes, "…information regarding the Company Group's business, operations. . ." whether the information is actually proprietary or obtained as a result of Ms. Poccia's consulting relationship with Tricoci. (*See id.*) The Confidentiality Covenant nebulously extends the obligations for the "longest period thereafter permitted by law," and thus, has no temporal scope.  (*See id.*)

*Fifth*, the Agreement purported to impose a non-compete obligation on Ms. Poccia, which Tricoci does not seek to enforce through the Motion. (*See Id.* ¶ 22, Ex. A.) Of note, however, is that this provision's application is far narrower than the injunctive restrictions Tricoci now seeks under its dubious trade secret theories. At its broadest, Section 8 of the Consulting Agreement claimed to require that Ms. Poccia refrain from "engag[ing] anywhere in the Territory in any business . . . competitive with [Tricoci's] business." (*Id.*) The term "Territory" is limited to "the primary area of any city which the Company has either signed a lease to open or is in negotiation to sign a new lease prior to the Termination Date . . . ." (*Id*.) Tricoci only has locations in the Chicago metropolitan area. (Poccia Decl. ¶ 15.) Tricoci was aware of Ms. Poccia's business incubator, Ideavation, for at least five months prior to initiating this litigation and never took the

7

position that it is a "competitive" business. (*Id.* ¶ 49, Ex. F.) And Ms. Poccia currently works in New York as a Board Member of Blue Mistral and acting Chief Executive Officer of Fekkai, well outside the Chicago metropolitan area where Tricoci operates. (*See* Poccia Decl. ¶ 51.)

### C. Tricoci Breaches Ms. Poccia's Consulting Agreement.

In 2019, Ms. Poccia began in earnest working through Phase 1 of Tricoci's goal of making economically viable products that could be sold to an audience beyond its installed base of hair salon and spa customers. (*Id.* ¶ 24.) Tricoci preferred that Ms. Poccia use Tricoci's pre-existing suppliers and manufacturers for these products — none of which Ms. Poccia had been exposed to in her decades-long career in the prestige beauty product industry. (*Id.*)

In her time with Tricoci, Ms. Poccia had limited access to Tricoci's electronic systems. (*Id.* ¶ 27.) Mostly, she could receive information from Tricoci by requesting it from certain people. She had a Tricoci e-mail account, but used her personal computer and phone for her work. (*Id.* ¶ 27.) She understood Tricoci's structure but knew little about the main component of Tricoci's business – salons and spas. (*See id.* ¶ 28.) Ms. Poccia was generally aware of Tricoci's tight budget, and understood their plan to roll out economically viable products as new brands under the Tricoci name. (*Id.*) As Ms. Poccia has done with numerous businesses in her career, she helped Tricoci develop the Tricoci Collection plan using her industry knowledge, with a basic understanding of Tricoci's operations and priorities. (*Id.* ¶ 29.) Her short tenure with Tricoci, however, was focused almost entirely on reformulating a handful of Tricoci existing hair products, mostly its shampoos, conditioners and stylers. (*Id.* ¶ 28.)

On or about March 20, 2020, Ms. Poccia received notice from Mr. Santiago informing her that her contract would be terminated effective immediately in light of the impact of COVID restrictions on Tricoci's revenue. (*Id.* ¶ 46.) Despites the Consulting Agreement's 30-day notice

provision, Tricoci stated that it would only pay Ms. Poccia through March 31, 2020, but would pay no additional amounts thereafter. (*See id* ¶ 47.) In not paying Ms. Poccia through her contractual notice period, Tricoci failed to pay Ms. Poccia approximately $20,000.00 in consulting fees owed to her. (*Id.* ¶ 43).

As a courtesy, Ms. Poccia agreed she would finalize a handful of additional projects for Tricoci free of charge through summer 2020. (*Id.*) With her contract terminated and no employment, Ms. Poccia made clear to Tricoci representatives that she would pursue other opportunities. (*Id.* ¶ 48.) Tricoci knew, for instance, that Ms. Poccia had started a consulting business called Ideavation. (*Id.* ¶ 49.) In June 2020, Mr. Santiago responded to an email sent by Ms. Poccia regarding her business venture with Joanna Coles, Ideavation. (*Id.* ¶ 49, Ex. D.) In Ms. Poccia's email, she disclosed her partnership with Ms. Coles, as well as their planned work which would involve negotiating and managing retail partnerships in the beauty space. (*Id.*) Ms. Poccia offered to schedule a Zoom meeting to discuss Ideavation's business model. (*Id.*) In response, Mr. Santiago stated, "Congrats. Sounds like a great opportunity," and asked Ms. Poccia to let him know when her calendar opened up. (*Id.*; *see also* Ex. E.) Notably, Mr. Santiago never asked any further questions regarding Ideavation. (*Id.* ¶ 49.) During the summer of 2020, Ms. Poccia used her Tricoci email for the few Tricoci projects she was completing. (*Id.* ¶ 50.) Knowing Ms. Poccia was actively working in the beauty industry, Tricoci still maintained Ms. Poccia's access to its e-mail servers until October 2020. (*Id.*)

Ultimately, Ms. Poccia secured work with Blue Mistral, the holding company for Fekkai, in or around April 2020. (Poccia Decl. ¶ 51.) Her work initially involved Bastide, a beauty and lifestyle company owned by Blue Mistral and affiliated with Fekkai. (*Id.*) Six months later, on the afternoon of October 23, Tricoci CEO Santiago called Ms. Poccia's mobile phone twice. (*Id.* ¶

56.) Ms. Poccia was in meetings and could not answer but thereafter texted Mr. Santiago asking if he could "chat over the weekend." (*Id.*, Ex. F.) Mr. Santiago responded a short time later, stating "Sure. Thanks. Have a few competitive issues and our attorneys are involved." (*Id.*) Mr. Santiago and Ms. Poccia spoke by phone two days later, and, among other things, Mr. Santiago directed Ms. Poccia to delete all electronic Tricoci information within her possession, custody, or control. (*Id.* ¶¶ 56-57.)

### D. Ms. Poccia's work with Ideavation and Fekkai

Ms. Poccia is long-time friends with Joanna Coles, a former Chief Content Officer for Hearst Magazines and well-known fashion executive. (*Id.* ¶¶ 32-33.) Among numerous other ventures, Coles sits on the Cornell Capital board. (*Id.* ¶ 33.) Cornell Capital is also an investor in Blue Mistral, the holding company for Fekkai. (*Id.*) In May 2019, Coles contacted Ms. Poccia about a business idea for a beauty product incubator (hereinafter "Ideavation") aimed at connecting social media influencers and celebrities to create their own upstart fashion and beauty lines. (*Id.* ¶ 32.) The model was premised on the idea that barriers to entry in the beauty product market have lowered substantially by leveraging celebrity marketing, who already reach an installed base of millions of followers. (*Id.* ¶ 34.) With the understanding that Tricoci was her primary commitment at the time, Ms. Poccia agreed to assist Ms. Coles in preparing a business plan and presentation that would ultimately be presented to investors. (*Id.*) Although it is in the beauty space, Ideavation is not a beauty product company competitive with Tricoci, nor does Tricoci purport that it is. Ms. Poccia was a consultant for Tricoci, she has years of experience serving as a consultant, and there was nothing improper about Ms. Poccia performing such non-competitive work. Beginning in May 2019, Ms. Poccia and Coles continued developing a business plan for Ideavation. (*See id.*) When Tricoci claims through its briefing that Ms. Poccia met with "Fekkai Representatives," at various

10

times in 2019 and early 2020, it mostly refers to Ms. Coles, or meetings with other Cornell Capital representatives who were considering investing in Ms. Coles's business idea, Ideavation, which Ms. Poccia assisted with and ultimately co-founded.

Starting in late spring 2019, Ms. Coles and Ms. Poccia met with Cornell Capital to discuss potential investments in Ideavation, strategy, and how to structure the business to make it economically viable in the long-term. (*Id.* ¶ 38.) In one instance in March 2020, just prior to Tricoci's termination of her Consulting Agreement, Ms. Poccia met with Cornell Capital and Ulta to discuss Ideavation. While Ms. Poccia did sit in on an Ulta meeting previewing Fekkai's products, she did not participate and left 45 minutes into the meeting. (*See* Poccia Decl.¶¶ 44-45.)

Cornell Capital is, as stated, an investor in Blue Mistral. (*See id.* ¶ 33.) Beginning in or around January or February 2020, Cornell Capital questioned whether if it invested in Ideavation it could enter into a shared services model agreement with Blue Mistral to share various back-of-house operations (i.e., IT, HR, and other non-substantive functions), thereby reducing administrative costs. (*Id.* ¶¶ 43-44.) Around this same time, Cornell Capital asked Ms. Poccia to opine on business structure – given that there was the potential for a shared services model, they felt it important that she advise on how the structure would work. (*Id.*) Ms. Poccia used her personal experience in these areas to analyze this structure of shared back-of-house operations, but nothing came of these tasks, and it involved nothing relevant to her Tricoci work. (*Id.*)

It is against this truthful and clarified factual backdrop that Tricoci seeks to make much of nothing. Tricoci cites e-mails taken out of context to draw false conclusions suggesting Ms. Poccia was "double dipping" with Fekkai or sharing Tricoci's trade secrets. This is simply false.

11

**1. Tricoci's Baseless Reliance on Non-Confidential or False Documents to Support Its Contractual and Trade Secret Theories.**

This case is ultimately about whether there is evidence suggesting Ms. Poccia acquired and thereafter improperly disclosed Tricoci's trade secrets or confidential information. She did not. After extensive forensics on Ms. Poccia's personal devices, there are only five documents at issue. Three contain no trade secret or confidential information regarding Tricoci (and both are at least two years old), another is fabricated evidence, and the last is a two-year old document which was never used or disclosed for a competitive purpose.

As set forth in Part I, on their face, three documents contain no further explanation to show there is no trade secret Tricoci information: *a school report* on branding in the toothpaste industry prepared by Tricoci intern Alex Flores, and sent to Ms. Poccia for her review (Poccia Decl. Ex. B.); the Ideavation Deck, never viewed by Tricoci, containing absolutely no Tricoci information (Poccia Decl. ¶ 39); and a Tricoci magazine that was packaged just four days later and published just three weeks thereafter eliminating any possible argument for trade secret protection and for which Tricoci cites no evidence whatsoever to show it was ever disseminated by Ms. Poccia to third parties (Pl.'s Br. p. 12.)

In sole substantive support of its inevitable disclosure trade secrets theory, Tricoci cites two documents. *First,* Trococi cites to an Exhibit 64 they claim shows Fekkai Controller Joseph SantaCroce sending an e-mail *to* Ms. Poccia on October 20, 2020 containing a document called "December 2019 S&OP Meeting see slide 7 Mario Product." (*See* Pl.'s Br. at p. 13; Pl.'s Br. Ex. 64; *see also* Part I.) According to Tricoci this alleged attachment contains "highly confidential" information "includ[ing] a summary of all of Tricoci's products, costs, sales information, and other trade secret information." (Pl.'s Br. at p. 13.) Neither this e-mail nor this attachment exists and could only have been included as an exhibit to appear this way if Tricoci took specific steps to

12

produce them in a certain format. As stated under oath by Andy Spore, who is the Senior Digital

Forensic Examiner for Legility—the third party ESI vendor retained by all parties to this action

for ESI issues and data extraction:

> After conducting an in-depth examination (described in subsequent Paragraphs), I
> can state with a reasonable degree of certainty that the PowerPoint attachment was
> *not* included in the original email, despite the image reflected in Exhibit A.
> Although the email and PowerPoint attachment appear, at first glance of Exhibit A,
> to have been sent together as one full and complete email, the documents reflected
> in Exhibit A do not represent an individual e-mail, but rather are fragments of
> multiple emails that were unintentionally combined during the File Carving process
> (defined in Paragraph 11), which led the data to appear to belong to a single email
> file.

(Spore Decl. ¶ 10.)

File Carving is a process that can pull fragments of data from a computer's free space and

combine them into a single document which is not an accurate depiction of the original document.

If an individual is looking at a document under the "Viewer," setting in Relativity, the individual

will see the inaccurate document. However, the individual will quickly understand the document

is inaccurate when attempting to review the attachment to the email, or at the latest, when the

individual produces the document out of Relativity. (*Id.* ¶ 11.) When documents are produced out

of Relativity, they are produced as "Images" which always shows the true and accurate copy of

the document. Documents cannot be produced out of a "Viewer," setting without manipulation.

Here, if Tricoci's counsel had produced the document correctly as an Image, the true and accurate

email shown in Exhibit 64 would have shown that "no attachment was included with the e-mail

received by Ms. Poccia." (*Id.* at ¶ 14.)  Put another way, to produce the document as Tricoci's

counsel did, they would have had to convert the document to an Adobe PDF and then manually

prepare it as an exhibit. Mr. SantaCroce also confirms Exhibit 64 was manufactured evidence by

swearing under oath that he "did not receive such an email or attachment from Ms. Poccia."

(SantaCroce Decl. ¶ 7.) As Exhibits A-1, A-2, and B to Mr. SantaCroce's e-mail make clear, the

*actual* e-mail exchange between Ms. Poccia and Mr. SantaCroce involves communications about an Ulta Sales Plan, attached as Exhibit A-2, specific to Fekkai. (*See* Santacroce Decl. Exs. A-1, A-2, B.) Tricoci's claims are therefore meritless and potentially worse.

*Second*, Tricoci cites a March 2019 PowerPoint presentation she sent to Ms. Coles in May 2019 ("MT Deck)," *see* Part I; *see also* Pl.'s Br. at p. 5.; Pl.'s Br. Ex. 17). A review of this document shows that it contains no confidential information and was clearly not sent to Ms. Coles for any competitive purposes. Ms. Poccia began discussing Ideavation business planning and related pitch deck materials with Ms. Coles during the May 2019 timeframe. Ms. Coles asked Ms. Poccia if she had template pitch decks she could review for seeking Ideavation funding. Ms. Poccia responded with the presentation PowerPoint (the "MT Deck") she prepared for Tricoci's leadership meeting at the start of Ms. Poccia's consultancy. (Ex. 17, ECF No. 60-1.) The MT Deck—notably over two years old—references publicly available information to describe available market share and opportunities in the beauty industry. All financial figures are based on publicly available research of the beauty industry pulled from market research firm NPD, which Ms. Poccia cites throughout her presentation. Indeed, slides 2, 3, 4, 6, and 7 are based exclusively on NPD market research data obtained using Ms. Poccia's own funds through her Dragonfly Sage business. (Poccia Decl. ¶ 29.) Slides 5, 8, 9, and 10 reflect Ms. Poccia's own general product and marketing recommendations based on her knowledge, experience, and research in the industry rebranding products and making them more appealable for mass distribution. Her advice is untethered from Tricoci. (*Id.*)

### 2. Tricoci's Unsupported Reliance on Innuendo.

Tricoci next cites e-mails, many it has again never seen, to suggest that Ms. Poccia was working with Fekkai as early as 2019. This is simply not the case. Tricoci's falsehoods are too many to enumerate but Ms. Poccia summarizes as follows:

- Ms. Poccia sent an e-mail to Molly Sloat stating that she wanted to discuss something "very big and confidential," in reference to Ideavation, in which Ms. Poccia sought Sloat's input. (Pl.'s Br. at p. 5; Ex. 20; Poccia Decl. ¶ 37.)

- Tricoci claims Ms. Poccia "performed competitive work for Fekkai Entities throughout the remainder of 2019" and that she had regular contact with Fekkai during this time. (Pl.'s Br. at p. 6; Exs. 16, 20–29.) This is again entirely false. Ms. Poccia worked at Tricoci as a consultant and worked with Coles on Ideavation. Ms. Poccia did, later in her tenure have limited contact with Fekkai in 2020 as it relates to a shared services model for Ideavation. (*See generally* Poccia Decl.)

- Citing an e-mail string about dinner in the Chicago suburbs, Tricoci claims Ms. Poccia met with "Cornell/Fekkai representatives" on or about September 5, 2019. (Pl.'s Br. at p. 5; Ex. 26.) This is again false. Ms. Poccia did meet with Cornell Capital representatives to discuss Ideavation. (Poccia Decl. ¶ 38.)

- Again without having ever seen the document, Tricoci suggests Ms. Poccia may have been sharing Tricoci confidential information with Fekkai on June 1, 2019. (Pl.'s Br. at p. 5, (Ms. Poccia "continued performing competitive work, and on June 1, 2019 discussed Fekkai product branding with Coles.").) Attached as Poccia Declaration Exhibit C is a true and correct copy of the document Tricoci cites. It is an e-mail between Coles and Ms. Poccia regarding the Ideavation pitch deck. Ms. Coles attached a deck prepared for Cornell Capital, and recommended pulling two biographical slides on Cornell Capital from this deck. (*Id.* Ex. C; Poccia Decl. ¶ 36.) The deck does relate to Fekkai, which Cornell Capital invests in, but the purpose of the e-mail was clearly and expressly to take Cornell biographical slides to be used for the Ideavation deck, a non-competitive business idea developed by Ms. Poccia and Ms. Coles.

- Similarly, Tricoci claims that on October 27, 2019 Ms. Sloat and Ms. Poccia "communicated on their private e-mails to determine what type of work and aesthetic the Fekkai Entities desired for its upcoming projects." (Pl.'s Br. at p. 7; Ex. 28.) Again, this document says nothing about Fekkai entities, Fekkai's aesthetic, or Fekkai projects. This was a list of questions to beauty product retailers who may be interested in investing in Ideavation's business, which is and was entirely non-competitive with Tricoci. (Poccia Decl. ¶ 40.)

- Citing an e-mail Tricoci has again never seen, Tricoci claims Ms. Poccia exchanged communications with Ms. Sloat about Fekkai on September 17, 2019. (Pl.'s Br. at p. 6;

15

Ex. 27.) This is again untrue. Ms. Poccia sent the Ideavation Deck to Ms. Sloat for her feedback. (Poccia Decl. ¶ 39.)

- Next, relying on Exhibit 34, Tricoci alleges Ms. Poccia improperly forwarded herself Tricoci's "board slides . . . which included all of Tricoci's products, strategies, and finaincials . . . ." (Pl.'s Br. at p. 8; Ex. 34.) Exhibit 34 simply shows Ms. Poccia sending Tricoci board presentation slides to Tricoci intern Alex Flores for Tricoci's files. (Poccia Decl. ¶ 41.)

- Tricoci also claims Ms. Poccia thereafter worked with Fekkai to "get his products into Ulta." (Pl.'s Br. at p. 8; Ex. 33.) This is again false. Fekkai's products have been sold at Ulta for years and she never pitched Fekkai to Ulta while affiliated with Tricoci. (Santacroce Decl. at ¶ 3 ("ULTA, a long-time distribution partner of Fekkai"); (Poccia Decl. ¶ 45.)

Finally, despite Tricoci's baseless insistence, Tricoci and Fekkai are *not* competitors. Tricoci may have preparatory plans, but Fekkai has been broadly sold in distribution centers since at least 2005, has been in Ulta since at least 2017, and ***sixty-seven percent*** of its business is retail sales. (Supp. SantaCroce Decl., *Id.* ¶¶ 3-9.) Tricoci's efforts to distort and misrepresent the record with impunity should not be countenanced.

## III.  ARGUMENT

Ms. Poccia knows this Court is well-versed in the elements required for a preliminary injunction, "an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). Tricoci's factual and legal arguments are unfounded and warrant prompt rejection.

### A.  Tricoci Is Unlikely to Succeed on The Merits.

#### 1.  Tricoci's Spurious Request That the Court Issue a Worldwide Non-Compete Based on Non-Existent or Non-Confidential Documents Must Be Rejected.

Relying on the "inevitable disclosure" theory, Tricoci asks this Court to keep Ms. Poccia from working for "Fekkai, Fekkai-affiliate entities, or any other direct competitor until such time as Tricoci's confidential and trade secret information [Ms. Poccia] acquired no longer has value."

16

(ECF No. 58.) And on what does Tricoci base this all-encompassing, global non-compete request? *First*, as detailed, Tricoci speciously relies on five documents (i) one of which has nothing to do with Tricoci (Ideavation Deck), (ii) one of which was manufactured and does not exist (False SantaCroce-Poccia Email**)**; (iii) one that contains public information and otherwise reflects Ms. Poccia's basic industry knowledge (MT Deck); (iv) one that Tricoci "presumes" was divulged to third parties but has no evidence of that fact (and was a magazine published a short time later) (the Tricoci Magazine); and (v) one that is a school project relating to toothpaste branding having nothing to do with Fekkai or Tricoci. *Second*, Tricoci relies on baseless innuendo, almost entirely belied by record evidence in an effort to suggest that because Ms. Poccia was speaking to Cornell Capital and had some business interactions with Fekkai, she must be motivated to share Tricoci's purported confidential information and trade secrets. The facts decidedly do not warrant the extreme relief Tricoci seeks.[2]

The doctrine of inevitable disclosure is rarely applied, "recognizing that a broad application would be an effective bar against employees taking similar positions with competitive entities." *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011) (internal quotation omitted). And as a matter of law, Tricoci must do more than allege "a person assumed a similar position at a competitor"; it must allege facts illustrating, among other things, that "**the defendant "could not operate or function in the new position without relying on the trade secrets.**" *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1070 (N.D. Ill. 2020) (emphasis added). Indeed, "the mere fact that a person assumed a similar position at a competitor does not,

---

[2] In determining whether the inevitable disclosure theory applies, the Court must analyze (1) the level of competition between the former employer and new employer; (2) whether the employee's new position is comparable to her prior position; and (3) the actions the new employer has taken to prevent the new employee from using or disclosing the trade secrets of the former employer.

without more, make it inevitable that [s]he will use or disclose . . . trade secret information so as to demonstrate irreparable harm." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995). Simply stated, this theory is not meant as a "reserve clause for solicitous employers." *Id.*; *see also Packaging Corp. of Am., Inc.*, 419 F. Supp. 3d at 1070 (N.D. Ill. 2020).

Here, Tricoci has not even explained what trade secrets are at issue beyond reliance on hollow litigation buzzwords and citation to five documents all only serving to illustrate the dubiousness of Tricoci's theories. And any suggestion that Ms. Poccia — a 35-year veteran of the beauty industry with decades of experience specializing in reinvigorating company-specific product brands — would need to or wish to use any Tricoci information in her time at Fekkai is frankly untethered from reality. Ms. Poccia used her general skills and expertise to aid in Tricoci's business and her contract was terminated while she was chiefly working on updating a single set of products for Tricoci. And Fekkai is an established retail brand whose retail business predated Tricoci's by several years and dwarfs Tricoci's retail business. (*See* Supp. SantaCroce Dec. ¶¶ 2-9; Poccia Decl. ¶ 52). None of the elements warranting inevitable disclosure are at issue here.

Three other logically dispositive points warrant this outcome. *First*, Tricoci's all-encompassing non-compete request is facially overbroad. Tricoci does not limit its request to Fekkai; it seeks to bar Ms. Poccia from working for any "direct competitor." Tricoci does not explain what this means. Should the Court rely on Tricoci's own say-so that Ms. Poccia's next employer is a "direct competitor"? And how is the Court to issue an injunction in this regard when a key element of the inevitable disclosure doctrine is the level of competition between the new employer and Tricoci? *Second*, as summarized above, Tricoci is asking this Court to apply a non-compete not even its own Consulting Agreement with Ms. Poccia would justify. Ms. Poccia works for Fekkai in New York; Tricoci has no New York locations, and there is therefore no restrictive

covenant obligation (*see* Part II.B). Tricoci plainly recognizes that even if it was able to convince this Court that her non-compete obligations applied (and they do not), Ms. Poccia left Tricoci in March 2020, and her two-year non-compete term would therefore expire in just nine months. This certainly explains why Tricoci resorts to specious and unsupported trade secret allegations in an effort to keep Ms. Poccia from her career.

*Third*, over 14 months have passed since Ms. Poccia had a paid relationship with Tricoci; Tricoci abruptly ended her work with the company in March 2020, and Tricoci cites documents dating back two years in sole support of its claim that trade secrets may have been misappropriated. Further, Tricoci has no evidence Ms. Poccia has used or relied on any of its trade secrets in her work for Fekkai, nor is there any logical reason she would do so for reasons already stated. *See Cintas Corp. v. Perry*, No. 03 C 8404, 2004 WL 2032124, at *18 (N.D. Ill. Aug. 20, 2004) (denying preliminary injunction on trade secret claim where plaintiff was unable to produce any evidence of use of confidential information during the eight months the employee worked for the competitor).

Whatever the reason for Tricoci's specious theories, the facts are clear that an injunction restricting Ms. Poccia from working in an industry she has been in for decades is entirely unjustified, as is any injunction containing any form of non-compete terms. Tricoci jumbles and misstates facts, and gravely misapprehends the holding of *PepsiCo*, which involved a defendant who made "out and out lies," retained explicit and uniquely competitive information, and went to an objectively "fierce" competitor in the "new age" sports beverage industry whose knowledge would directly undercut the business of the plaintiff.[3] This case has been ongoing for six months,

---

[3] It is also worth noting that even in *PepsiCo*, the request by the Plaintiff was an injunction for **six months.** Tricoci asks for an indefinite non-compete injunction of an indefinite duration *after* Ms. Poccia has already gone to Tricoci's perceived "competitor."

19

Ms. Poccia is already acting CEO of Fekkai and Tricoci has presented nothing suggesting any harm from that position. Further, it involves purported information that is at least two years old (most of which has nothing to do with Tricoci or was fabricated), and involves a 35-year industry executive specializing in branding, marketing, and distribution expansion who is CEO of an established hair and beauty retail product company, after spending just 13 months working for a regional hair salon and spa.[4]  There is no comparison.

Ms. Poccia implores this Court to ignore Tricoci's farrago of unsupported conclusions and misrepresented "facts," based largely on documents Tricoci has not even reviewed. Inevitable disclosure does not apply, and the Court should reject Tricoci's request in full.

### 2. Tricoci Otherwise Fails to Demonstrate Any Violation of the ITSA or DTSA.

Tricoci also cannot make a showing that it is likely to succeed on the merits of its claims under the ITSA and DTSA. Under both theories, Tricoci must show "(1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure or use; and (3) the misappropriation damaged the trade secret's owner." *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. Apr. 7, 2016). Integral to any ITSA or DTSA claim is making a targeted showing of (1) the existence of a trade secret; and (2) reasonable efforts to maintain the secrecy of any purported trade secrets. *See* Abrasic *90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888 (N.D. Ill. 2019). Tricoci fails on both fronts.

*First*, trade secrets are not at issue, as discussed in detail above in Parts I, II.D.1, and III.A.1. Tricoci's baseless assertion that this information — much of which has nothing to do with Tricoci's business whatsoever, or worse, is not real — is stunning, telling, and dispositive.

---

[4] *Triumph Packaging Grp.*, 834 F. Supp. 2d at 807 (distinguishing *PepsiCo*, in part, because the two companies were not fierce competitors where the companies operated in mostly separated industries and did not share customers, rejecting plaintiff's argument based on potential future competition).

*Second*, the facts show Tricoci failed to make reasonable efforts to maintain the secrecy of the information at issue. Setting aside Tricoci's boilerplate "reasonable efforts" allegations, the facts belie Tricoci's claims. Tricoci allowed Ms. Poccia to use her personal Gmail when conducting business for Tricoci, and Tricoci allowed her to retain access to Tricoci information vis-à-vis her Tricoci e-mail account through October 2020, despite knowing she was transacting other business with other companies. *See, e.g., CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 885 (N.D. Ill. 2009) ("failure to ensure that [defendant]'s laptop was stripped of [allegedly protected Information] when she left the company goes to show that it did not treat such Information as confidential or a trade secret."); *Meade Elec. Co. v. Wicks*, No. 1-09-2933, 2011 WL 9933759, at *6 (Ill. App. Ct. May 9, 2011) (information not trade secrets in part because plaintiff allowed project managers to take information home on laptop computers). Indeed, Tricoci makes no allegations that it took any effort to protect its purportedly confidential information with Ms. Poccia — an independent contractor who was not tethered to any handbook policies and used a limited amount of information to perform her narrow duties — beyond that which it takes to protect its general business information. That, in and of itself, is dispositive of the inquiry. *See Abrasic 90 Inc.*, 364 F. Supp. 3d at 902 (N.D. Ill. 2019) (rejecting trade secret claim largely for failure to maintain secrecy and noting that the plaintiff "took no measures to protect that information that were in any way different (much less more exacting) than the steps that it took to protect information that was indisputably not a trade secret.").

*Third*, despite the production of over 20,000 documents and six months of discovery, there is no evidence Ms. Poccia ever used any document allegedly at issue for any competitive purpose. *See Packaging Corp. of Am., Inc.*, 419 F. Supp. 3d 1059 (dismissing an ITSA action where a

21

plaintiff alleged no facts that the defendants used the trade secret information in their business). There is no merit to Tricoci's trade secret claims and they should be rejected in full.

### B. Ms. Poccia Did Not Violate the Consulting Agreement as a Matter of Fact and Law.

Nor did Ms. Poccia violate her Consulting Agreement based on any alleged taking or dissemination of information. Three points compel this finding. *First*, as a threshold matter, Tricoci's Confidentiality Covenant with Ms. Poccia is unenforceable as a matter of law. It is well-established that in Illinois a restrictive covenant is reasonable only if it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. Ct. App. 2011). Here, the Confidentiality Covenant by its terms prohibits the use or disclosure of *any* information or knowledge gained during her short tenure with Tricoci, regardless of whether she gained that knowledge through her employment.[5] *See Rubloff Dev. Grp., Inc., v. SuperValu, Inc.,* 863 F. Supp. 2d 743, 749 (N.D. Ill. 2012) (requirements post-employment providing for "absolute secrecy of any and all information [are] unreasonable and unenforceable because a person is allowed to make a living, and cannot possibly not utilize *any* information from his past job."); *see also AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463, 476 (Ill. Ct. App. 2015) ("[t]here is a great deal of information that is not 'generally' known to the public; not all of it merits protection under a confidentiality provision"). Further, the Consulting Agreement purports to limit use or disclosure of ". . . information regarding

---

[5] While Tricoci's Memorandum states there is an employee non-solicit provision in the Agreement, Tricoci does not allege that Ms. Poccia breached the employee non-solicit. Pltff. Mem., p. 21. Nonetheless, without waiving any defenses she has to the enforceability of the employee non-solicit provision, Ms. Poccia is willing to stipulate to a preliminary injunction order instructing her to comply with the employee non-solicit but will not stipulate to an employee non-solicit without any durational limit as requested in Tricoci's Amended Motion for Preliminary Injunction ("Pltff. Mot."), p. 5 (Dkt. No. 58).

the Company Group's business, operations. . ." without any temporal scope and regardless of whether the information is actually proprietary or obtained as a result of Ms. Poccia's consulting relationship with Tricoci.

*Second*, Tricoci's attempt to leverage this overbroad Covenant to ask for an order precluding Ms. Poccia from working for Fekkai or a "direct competitor . . . . until such time as Tricoci's confidential and trade secret information they acquired no longer has value" further warrants a finding against Tricoci on these facts. Tricoci seeks a global non-compete based largely on conclusory allegations of confidential information it cannot seem to specify beyond a superficial level after the production of over 20,000 documents. Tricoci cites no case law to support its outrageous request, nor can it. Illinois does not allow near-permanent non-compete agreements. *See Quixote Transp. Safety, Inc. v. Cooper*, No. 03 C 1401, 2004 WL 528011, *6 (N.D. Ill. Mar. 12, 2004) (declining to enforce a confidentiality agreement without a durational limitation, recognizing Illinois courts have "long rejected the reasonableness" of such near-permanent non-compete agreements).

*Third*, Ms. Poccia did not materially breach the Confidentiality Covenant. The only breach of the confidentiality covenant that Tricoci identifies in its Memorandum is an email Ms. Poccia allegedly sent to Fekkai's Controller, entitled "December 2019 S&OP Meeting see slide 7 Mario Product." (Pl. Br. pp. 13 and 23.) That e-mail literally does not exist and, worse, appears to have been manufactured for use as an exhibit. (Spore Decl. ¶¶ 2-14.) At best, the evidence shows Tricoci attached an image revealing a corrupted file in the extraction process. It simply never should have been introduced into evidence. (*Id.*) Nor for reasons already discussed above are any of the other documents "confidential."

23

*Fourth*, unlike Ms. Poccia, Tricoci *did* indisputably breach the Consulting Agreement and Ms. Poccia was relieved of any obligation to comply with the restrictive terms. Tricoci terminated Ms. Poccia's contract without providing 30-days' notice as required and thereafter failed to pay Ms. Poccia all amounts due and owing under that contractual notice period. *Weber Shandwick Worldwide v. Reid*, 2005 WL 1651030, at *3 (N.D. Ill. May 12, 2005) ("party's material breach of contract discharges the other party from a duty to perform under the *same* contract."). Again, Tricoci's theories should be rejected for reasons thoroughly discussed above.

### 1. Tricoci Will Not Suffer Irreparable Harm and Does Not Lack an Adequate Remedy at Law

Tricoci claims Ms. Poccia's purported conduct will cause irreparable harm because trade secrets were misappropriated, because Ms. Poccia performs the same duties at Fekkai as she does at Tricoci, and because Ms. Poccia purportedly "usurped" opportunities with Ulta through Fekkai. As the facts show, quite literally none of this is true. Ms. Poccia is not a contract consultant at Fekkai focused on a single product line; she oversees the entire operation of a company dwarfing Tricoci and long-established in the industry; no trade secrets were misappropriated as discussed exhaustively. Tricoci has no basis for irreparable harm, and its claims are wholly unsupported. And crucially, Tricoci seeks this injunctive relief *over two years* from the creation and limited disclosure of the information at issue. *See, e.g., Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 897 (N.D. Ill. 2015) (denying motion for preliminary injunction, in part, because delay in seeking relief weighs against injunction).

### 2. The Balance of Hardships and Public Interest Supports Denying the Preliminary Injunction Motion

Tricoci bears the burden of showing the harm it will suffer if an injunction is denied outweighs the damage that Ms. Poccia would suffer if it is granted. *See Meridian Mut. Ins. Co. v.*

24

*Median Ins. Group*, 128 F.3d 111, 1120 (7th Cir. 1997). Tricoci asks that the Court order Ms. Poccia to leave her 35-year career in the beauty product industry for an indefinite period (or stop working in specific business lines for an indefinite period) after she spent 13 months helping a regional salon and spa business recraft a specific set of products, only to have: (a) her agreement terminated, (b) to thereafter finish work through the summer of 2020 as a courtesy for no payment, (c) to then have Tricoci file a lawsuit against her, in which she has expended as an individual tens of thousands of dollars, to largely defend against allegations that she took Tricoci information that either does not exist, relates to toothpaste branding, was manufactured, or contains non-confidential information. Further, Ms. Poccia has been willing all along to enter into a limited stipulated injunction precluding her use or disclosure of trade secrets or confidential information; she has asked only for specific information regarding what actual confidential information or trade secrets Tricoci claims are at issue and will not agree to a non-compete. On these facts, public interest favors stopping Tricoci from using scorched earth tactics to litigate an individual defendant into the ground based on dubious claims and inaccurate allegations.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Ms. Poccia respectfully requests that this Court deny Tricoci's Motion in its entirety.

Dated:  June 1, 2021                             Respectfully Submitted,

/s/ *Colton D. Long*

James M. Witz
Colton D. Long
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL  60654
(312) 372-5520
clong@littler.com
***Attorneys for Claudia Poccia***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 1, 2021, I caused the foregoing ***OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION*** to be filed with the Clerk of the Court using the ECF filing system, which electronically served counsel for all parties of record in the above-captioned action.

*/s/ Colton D. Long*
One of Defendant's Attorneys

27