**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIO TRICOCI HAIR SALONS & DAY SPAS, LLC d/b/a Tricoci Salon and Spa, an Illinois corporation | ) ) ) | |
| | ) | Case No. 20-cv-07196 |
| Plaintiff, | ) | |
| | ) | Honorable Matthew F. Kennelly |
| v. | ) | |
| | ) | Hon. Mag. Gabriel A. Fuentes |
| CLAUDIA POCCIA and MOLLY SLOAT, | ) | |
| | ) | |
| Defendants. | ) | |

**MARIO TRICOCI HAIR SALONS AND DAY SPAS, LLC'S REPLY IN
SUPPORT OF ITS AMENDED MOTION FOR PRELIMINARY INJUNCTION**

Mario Tricoci Hair Salons and Day Spas, LLC d/b/a Tricoci Salon and Spa ("**Tricoci**"),

hereby submits its Reply in Support of its Amended Motion for Preliminary Injunction.

## I.     ADDITIONAL FACTUAL BACKGROUND

### A.   Fekkai and Tricoci Are Direct Competitors.

Fekkai and Tricoci are direct competitors in the industry of haircare products. Both

legacy founders, Frederic Fekkai and Mario Tricoci, recently purchased their haircare companies

back from private equity investors and embarked on strategic business efforts to rebrand their

haircare products as "prestige" products and sell those products in national retailers such as

ULTA and Sephora. Poccia began pitching Fekkai in April 2019, two months after she began

working for Tricoci, and around the time she e-mailed her accountant, Dan Floyd ("**Floyd**") to

inform him that she met Frederic Fekkai  ("**Frederic**"),  might begin advising him, and that she

thought it was a direct conflict with her work for Tricoci:

> 5. **Fredric Fekkai/ Bastide-**  This began as an exploratory for a Board role but could morph into a consultancy of FT role; it is a direct conflict with Tricoci.  I met Fredric a little over a week ago and await next steps re: any follow up from our meeting.

(Ex. 1). Both companies are selling the same products through the same mediums. For example, Fekkai sells its products on its own website, its salons, and at certain retailers. Fekkai's products are distributed nationally. Tricoci, likewise, sells its products in its salons and its own website, and distributes those products nationally. (https://www.tricoci.com/pages/shipping-returns). As discussed in further detail below, Poccia was hired to place Tricoci's products in national retailers such as ULTA. Below is a snapshot of Fekkai's and Tricoci's offerings on their respective websites for nationwide distribution.



(https://www.tricoci.com/collections/hair-care?_=pf&pf_t_brand=Brand_Tricoci%20Collection; https://fekkai.com/collections/all-products?sort=best-selling&compactView=true).

Both companies feature their founders in and throughout the company promotional materials. Many of the images of the founders and other company attributes present similar aesthetics on their websites:





(*See* https://www.tricoci.com/pages/our-story and https://fekkai.com/pages/about-fekkai). The similarities between the brands was noted by Poccia in a presentation that she provided to Tricoci, which indicated its top competitors in the prestige haircare product industry and included Fekkai as one of those competitors:



(Ex. 2).[1]

## B. Fekkai and Tricoci Hired Poccia to Perform the Same Work.

Tricoci hired Poccia because of her "expertise in brand strategy, business model design, operational effectiveness, creative and product development, brand/digital marketing, and business development." [Dkt. No. 94, Poccia Declaration ("**Poccia Dec.**"), ¶ 11]. Prior to working at Tricoci, Poccia did not have any hands-on experience in haircare or utilizing her "expertise" on behalf of a hair care company. (Ex. 3, Poccia Deposition ("**Poccia Dep.**"), 149:21-150:6). Her role at Tricoci was to "focus on upgrading their current hair care line and

---

[1] The Court should disregard Defendants' affidavit of Joseph Santacroce ("**Santacroce**"), Fekkai's Controller, to show that Fekkai and Tricoci are not competitors. He that he does not have the required knowledge to make that assessment and could not name any of Fekkai's competitors. (Ex. 4, Santacroce Deposition ("**Santacroce Dep.**"), 19:11-20:2).

beginning development on new brands that would ultimately end up in retail setting." (Ex. 3, Poccia Dep., 16:17-17:13). After Tricoci hired Poccia, she came up with Tricoci's rebrand strategy and pitched it in March 2019. (Ex. 5). That rebrand strategy included the ultimate goal of entering, as Poccia called it, "Specialty Cosmetics Retail," which included prioritization of ULTA, Sephora, and Blue Mercury. (*Id.* at p. 9). According to Poccia, her strategy would allow Tricoci to create "prestige" haircare products and enter national retailers, such as ULTA. (Ex. 3, Poccia Dep., 74:3-10, "Phase two, develop a line for retail and introduce Tricoci to Sephora, Ulta, Blue Mercury…). Poccia had Tricoci purchase various industry studies and research specific to prestige retailers to support her strategy. (Ex. 6-8). Poccia had oversight of Tricoci's product development, including its business strategy, pricing, formulas, and creative.

Fekkai was purchased by Cornell Capital, LLC ("**Cornell**") and Frederic in or about 2017. Fekkai has been unprofitable since at least 2019 and, in fact, has not had one profitable month since then. (Ex. 4, Santacroce Dep., 87:7-13). In 2017, Fekkai created a product line called "The One," which was sold at ULTA and was unsuccessful. (*Id.* at 27:7-19, 42:17-24). As a result of the poor performance, "The One" products were pulled from ULTA and other distribution chains and are currently being sold to discount chains like Nordstrom Rack to unload excess inventory. (*Id.* at 63:2-66:19). After failure of "The One", Fekkai began a rebrand of its product portfolio, which are those currently on its website. Those products went live on Fekkai's website in January 2020, but did not go live on ULTA's website until approximately May 2020 and were not sold in ULTA stores until September 2020. (*Id.* at 72:18-74:16). The overall goal of Fekkai's rebrand was to get their products out of mass retailers (Wal-Mart, CVS, Walgreens, and Kroger) and enter the "prestige segment" of national retail. (Ex. 9).

███████████████████████████

█████████████████. 3, Poccia Dep., 57:20-57:24, 133:13-133:22; Ex. 4, Santacroce

Dep., 87:7-13). Poccia has and has had oversight of Fekkai's product development, carrying

through its product rebrand, and strengthening its relationships with national retailers such as

ULTA and Sephora. (Ex. 3, Poccia Dep., 134:11-17). While Poccia's duties as CEO may be

broader than those she had at Tricoci, she nonetheless is responsible for product business

strategy and product development. Poccia prepares strategy presentations and presents them to

Fekkai's board and executive team, as she did for Tricoci.[2]

### C. Poccia was and has been competing in Chicago with Fekkai.

> i. *The documents that Poccia withheld for nearly four months show that*
> *Poccia worked for Fekkai in Chicago while engaged by Tricoci.*

Poccia was advising Tricoci on pitching ULTA and catering its products towards prestige

retail generally, she began advising Cornell and Fekkai in 2019 and continued to do so in early

2020 while she was still working for Tricoci. Specifically, Poccia was helping Fekkai and

Cornell strengthen the Fekkai haircare products and its relationship with ULTA. Poccia claims in

her Response that while she "did sit in" on an Ulta meeting previewing Fekkai's products, she

did not participate. (Ex. 3, Poccia Dep., 118:4-9). In reality, Poccia was intimately involved with

Fekkai's efforts in its product rebrands and pitching ULTA. She began attending Fekkai/ULTA

meetings in late 2019. In an e-mail between Poccia, Henry Cornell (head of Fekkai's owner,

Cornell Capital), Joanna Coles (Poccia's purported business partner), and others, she stated that

she planned to attend a meeting with ULTA on December 3, 2020:

---

[2] According to Defendants, all prestige haircare companies strive to enter their products in national retailers like
ULTA, and part of that initiative must include "clean" products, free of additives and chemicals. (Ex. 3, Poccia
Dep., 119:22-120:4, "absolutely all brands need to clean up their products in order to be competitive. And, yes, I
was working with Tricoci so that they could be competitive in retail").

Redacted

(Ex. 10). Redacted

Poccia continued to advise Tricoci on its efforts to enter prestige retail through ULTA, telling Mr. Santiago on January 13, 2020 that her contact at ULTA "already knows about us" and is "waiting for me to come in with final brand concept to pitch." (Ex. 11). She even advised Mr. Santiago that he should attend certain events to strengthen their efforts in entering ULTA:

| From: | Claudia Poccia [cpoccia@tricoci.com] |
|-------|--------------------------------------|
| Sent: | 2/19/2020 12:53:09 PM |
| To: | Chris Santiago [csantiago@tricoci.com]; Howard Silverman [hss@agmanpartners.com]; Mario Tricoci [mario@aparium.com]; Traci Tricoci [tracitricoci@gmail.com]; Cheryl Tricoci [ctricoci@aol.com] |
| Subject: | Fwd: WWD Beauty CEO Summit |

Hello from London!

I think this would be a great opportunity to get visibility for Tricoci; particularly as we begin to pitch Ulta and to enter into CRE Beauty Awards for 2020. I would suggest Transforming Mist.

Thoughts?

Claudia

**Claudia Poccia**
President, Hair & Beauty Product

(Ex. 12). Sometime thereafter, Poccia began working with Fekkai to prepare for the March 4 ULTA meeting regarding Fekkai's haircare products, referenced in detail in Tricoci's Amended Motion for Preliminary Injunction ("**Motion for PI**"). She met with Fekkai representatives on February 27 and, just before that meeting, [Redacted]

Redacted

(Ex. 13). Poccia created that rebrand strategy for Tricoci and Tricoci had followed it for the last twelve months. Poccia then met with Frederic and Ms. Cheng on March 3 in preparation for the March 4 meeting with ULTA. (Ex. 3, Poccia Dep., 115:19-117:22). The March 3, 2020 meeting also occurred in Chicago. (*Id.*). While Poccia claims that this and other ULTA meetings had nothing to do with haircare products, her follow-up emails to ULTA indicate that she was seeking to create a relationship between ULTA and Fekkai in "clean, salon haircare:"



(Ex. 14).

Redacted

(Ex. 15). This was after Poccia had advised Tricoci on its pricing strategy for well over a year and created a pricing strategy deck just before she left Tricoci. (Ex. 3, Poccia Dep., 125:10-19; Ex. 2, CPG Pricing Deck). That pricing strategy deck references Fekkai as one of Tricoci's main competitors. All the while, Poccia assured Tricoci that she wanted to finish out her projects with and would not "nickel and dime" Tricoci. (Ex. 16). In fact, some of the work Poccia performed for Tricoci had to be corrected, including formulas, packaging, and labeling. Poccia continued to work with Tricoci after the relationship was "paused" because of COVID. Poccia's Tricoci email remained active so that she could respond to the e-mails from manufacturers and vendors and because Tricoci anticipated her return.

ii. *Poccia built a Fekkai team in Chicago to work with Ulta.*

As explained in Tricoci's Motion for PI and the documents attached thereto, Poccia made a significant effort to hire Sloat at Fekkai. She was given autonomy by Frederic to hire someone for a creative marketing role and she suggested Sloat, in part because Sloat lives in Chicago and has physical proximity to ULTA's headquarters in Chicago. (Ex. 17). Poccia also tried to get Roxanne Paulson, a former Tricoci employee, hired at Fekkai because she is located in Chicago. (Ex. 18). Poccia made purposeful and targeted efforts to create a Chicago-based Fekkai team to work with Chicago-based company ULTA and compete with Tricoci.

**II.     Defendants Withheld Relevant Documents in Bad Faith.**

Defendant Poccia withheld nearly 14,000 documents that hit on the search terms agreed upon by the parties, including terms "Mario" and "Tricoci" that yielded Tricoci's own documents. These are documents that should have been provided to Tricoci months ago.  A review of the documents ordered produced by the Court under "Attorneys' Eyes Only" designation brings into question the thousands of other documents that Poccia designated as confidential and withheld from production, while claiming confidentiality and irrelevance. For

example, Exhibits 13 and 15 are the same documents that Poccia claimed could not be released due to third-party Fekkai's confidentiality rights and that caused Fekkai's own attorneys to interject in this action to prevent disclosure. The descriptions of these documents on Poccia's Confidentiality Log are inaccurate and misleading. ███████████████████

████████████████████████████████████████████████

█████████████████████████████████

| Confidentiality Basis | Confidentiality Assertion | |
|---|---|---|
| includes confidential information unrelated to this matter and subject to third-party confidentiality agreement | regarding discussions with Cornell Capital for development of the ULTA business strategy. | |

████████████████████████████████████████████████

██████████████████████████████

| Confidentiality Basis | Confidentiality Assertion | |
|---|---|---|
| includes confidential information unrelated to this matter and subject to third-party confidentiality agreement | regarding Fekkai product branding. | |

████████████████████████████████████████████████

████████████████████████████████████████████████

Poccia continues to withhold nearly 12,000 documents under similar confidentiality designations. Poccia did not produce any documents in response to Tricoci's Document Requests, other than those attached to her Response. Poccia selectively chose to divulge to the Court the documents that Tricoci referenced from her Confidentiality and Privilege Logs, while continuing to refuse production of the others mentioned in Tricoci's Motion for PI. [*See* Dkt. No. 59, Ex. 16, PCL, p. 3, PocciaConfid_0000054 – 55].

Rather than produce those documents, Poccia instead blamed Tricoci (and continues to blame Tricoci) because certain documents that *she* deleted were pieced together in such a way that renders them inaccurate. Such was the case with the Santacroce e-mail referenced in

Poccia's Response, in which she claims that Tricoci submitted "false" evidence in support of its Motion for PI. In fact, Poccia deleted thousands of relevant documents and the forensic vendor did its best to piece them back together. Specifically, with respect to a document in which it appears that Poccia exchanged with Santacroce, Fekkai's Controller, one of Tricoci's highly confidential financial documents with a subject line "for your eyes only," Poccia provided a declaration of forensic vendor indicating that the document, in fact, did not include Tricoci's finances as an attachment. Poccia's attorneys unilaterally deemed the document "false."

Poccia also attached to her Response a document which she purports to be the non-deleted version of the same e-mail that was provided to her by Mr. Santacroce. Tricoci made Poccia's counsel aware of this document in mid-March 2021, just after it was produced, in response to which Poccia's counsel indicated that she did not send Tricoci's confidential information to *anyone* at Fekkai. At that time, Poccia did not produce any documents disproving the deleted Santacroce e-mail that was recovered from her devices. Tricoci discussed this e-mail with the forensic vendor at length and, after its own forensic inspection, the vendor informed Tricoci that, while Poccia had deleted the e-mail, the attachment appeared on the image that was visible in the document review platform and that there was a likelihood that it did, in fact, contain Tricoci's financial document as an attachment. There is little significance to the vendor's process as to this document, other than to clear the accusations hurled by Poccia's counsel prior to them having done their own due diligence in the history of the documents exchanged between the parties. Attached hereto as Exhibit 19 is a *third* affidavit of Andy Spore further explaining the parties' efforts in recreating e-mails that Poccia deleted prior to the forensic inspection.

### III. <u>LEGAL ARGUMENT</u>

**A. Poccia Should Be Prohibited from Working for Fekkai Because She Disseminated and Used Tricoci's Confidential and Trade Secret Information on Behalf of a Direct Competitor.**

Tricoci's request to prevent Defendants from continuing to work for a direct competitor is not dependent solely on the risk of inevitable disclosure. Rather, Tricoci's request for relief is predicated on *actual* disclosure, in addition to Defendants' attempts to hide evidence and prevent Tricoci from proving its claims. In this respect, *RKI, Inc. v. Grimes* is instructive. The court issued an injunction prohibiting a former employee from performing sales or marketing activities for his new employer. 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001). The employee's new employment involved the same duties and responsibilities he had when working for the plaintiff, including calling the same customers. *Id*. at 868. The employee misappropriated the plaintiff's trade secrets by downloading, copying, and sharing them with his new employer and also used trade secrets to solicit plaintiff's customers. The court, quoting *PepsiCo, Inc. v. Redmond*, stated:

> It is frequently true in trade secret cases that misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases, plaintiffs like *PepsiCo* must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything."

*Id.* at 876 (quoting *PepsiCo*, 1996 W.L. 3965, *15 (N.D. Ill. 1996)). Here, Defendants denied all allegations against them, even where they were directly contradicted by documented evidence.

After granting a temporary restraining order on the same facts, the *Grimes* court found and explicitly held that the former employee went *beyond* the type of harmful behavior asserted in *PepsiCo* because he actually retained and disclosed information to his new employer. The former employee also deleted documents prior to forensic inspection and hid evidence. Accordingly, the court initially entered a temporary restraining order preventing the former employee from working for the new employer due to his actual misappropriation and use of his former employer's information. Following a bench trial on the merits, the court went on to say:

"the ITSA permits an injunction to issue to prevent even threatened use or disclosure of trade secrets. Moreover, the defendants' spoliation of evidence on their computer supports a negative inference that defendants destroyed evidence of misappropriation." *Id.* at 877.

The court further found that the former employee would inevitably continue to use the trade secrets in his new employment as the former employee's new employer were competitors – both were engaged in the business of producing and selling tube and pipe mill rolls. *Id.* at 863. Even if there were not actual disclosure, *PepsiCo* is a binding Seventh Circuit precedent and allows for courts to prohibit work based on inevitable disclosure. *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1272 (7th Cir. 1995). To date, the Seventh Circuit has not overturned *PepsiCo* and, in fact, it has been followed and adopted in Illinois state courts. *See Strata Mktg., Inc. v. Murphy*, 740 N.E.2d 1166, 1178 (2000). While Poccia claims she used "templates" and offered the same services to all her clients, she went beyond graphics and templates in relying on Tricoci's pricing and strategy information to advise Fekkai on its ULTA endeavors and general product strategies.

### B. The Information Defendants Misappropriated and Relied On for A Direct Competitor Are Trade Secrets.

The Tricoci documents and information in Defendants' possession, that Sloat forwarded to herself, and that Poccia forwarded to and relied on for the benefit of Tricoci's direct competitor are trade secrets: pricing strategy, research summaries, branding and product development, detailed financial information, formulas, and other information in board and executive presentations. The Defend Trade Secrets Act defines a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if: (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known

to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). Tricoci invested significant time and expense on its product rebrand, including hiring Poccia and investing the strategy that she created. This information, which is still in Defendants' possession, is a trade secret under the law. Tricoci paid for research and other resources which Poccia utilized to create a specific company business strategy related to Tricoci's haircare products – Poccia's compilation of information as it relates to haircare products is not publicly available and derives independent value. *Grimes*, 177 F. Supp. 2d at 873. ("An employer who invested time, money, and effort in developing a secret advantage should be protected from a former employee who obtains the secret improperly").

### C. Poccia's Confidentiality Clause Is Enforceable.

While Poccia claims that the confidentiality clause prohibits the use and disclosure of *any* information (Dkt. No. 94, p. 22), that is not what the confidentiality clause at Paragraph 9 of Poccia's Agreements states. It defines ten categories of documents with specificity and in accordance with its business model and the work that Poccia performed on behalf of Tricoci. *See HCC Cas. Ins. Servs., Inc. v. Day,* No. 20 C 7620, 2021 WL 1165096, at *7 (N.D. Ill. Mar. 26, 2021) (catchall confidentiality provisions including "any information relating to any aspect of a business" are unenforceable, but that those enumerating specific information are); and *F.T.C. v. OSF Healthcare Sys.,* No. 11 C 50344, 2012 WL 1144620, at *8 (N.D. Ill. Apr. 5, 2012) (pricing information, strategies, and other information that might give competitors an advantage are trade secrets) (citations omitted).[3] Even if the confidentiality clause were overbroad, the agreement contains a blue pencil provision. [Dkt. No. 59, Ex. 8, ¶ 12(b)]. In addition, Tricoci asserts

---

[3] Poccia abandoned her counterclaim in her most recently filed Answer and therefore Tricoci asks that the Court disregard any comments in her Response regarding the abandoned counterclaim.

violations of the Illinois and Defend Trade Secrets Acts. A confidentiality agreement is not a prerequisite to recovery under those statutes, nor has Poccia asserted any recognized contractual defenses in this respect. *Strata Marketing, Inc. v. Murphy,* 317 Ill.App.3d 1054, 1066 (1st Dist. 2000). It makes no difference whether Poccia was an employee or independent contractor. *See Eichmann v. Nat'l Hosp. & Health Care Servs.*, 308 Ill. App. 3d 337, 343 (1st Dist. 1999) ("Illinois law does not hold restrictive covenants contained in an independent contractor agreement to a less strict standard than those in employment contracts.") (citation omitted). In fact, independent contractors may be bound by confidentiality even without a written provision regarding same. *MPC Contain. Sys. v. Moreland*, 2008 U.S. Dist. LEXIS 60546, 23-24 (N.D. Ill. Jul. 23, 2008) (citing *Hicklin Eng'g, L.C. v. R.J. Bartell*, 439 F.3d 346, 349-50 (7th Cir. 2006)).

### D. Defendants Should Be Ordered to Share in the Fees and Costs Associated with the Forensic Inspection.

Defendants spent four months hiding evidence from Tricoci and the Court, including evidence showing that Poccia sent confidential trade secret information to Fekkai and Cornell representatives, relied on Tricoci's pricing information to advise Ms. Cheng and Fekkai's business strategy, and selectively disclosed documents as their filings became due, in direct violation of court orders regarding production and exchange of information. They concealed the nature of their employment, including by denying for months that Poccia was the CEO, and then admitting that she was, only to have the intervening Fekkai attorneys attempt to claim she is not the CEO. In her deposition, Poccia likewise refused to admit that she was the CEO. (Ex. 3, Poccia Dep., 13:12-16, "I am not the CEO of Blue Mistral. I am a working board member, and I am acting in that role in partnership with Frederic Fekkai"). Defendants' behavior caused Tricoci to brief three motions and waste significant expense on seeking production of the documents the Court ordered to be produced multiple times. Even more disturbing are the false Log descriptions

that Defendants used to mislead the Court and Tricoci into believing that the information at issue is Fekkai's proprietary information and not Tricoci's. To this day, Defendants continue to withhold nearly 13,000 documents on their Confidentiality Log and over 1,000 documents on their Privilege Logs without any identifiable legal basis.

## IV. CONCLUSION

Defendants stole, used, and will continue to use Tricoci's confidential and trade secret information on behalf of Fekkai absent a Court Order. Tricoci makes no objection to Poccia or Sloat working in the beauty industry generally, with the exception of haircare products that directly compete with Tricoci's haircare products, including their work in Chicago with Chicago-based retailers on behalf of Fekkai. They both continue to profess that their only relationship with Fekkai is as consultants and independent contracts. They can simply work for their other clients. Accordingly, Tricoci hereby submits a revised proposed preliminary injunction order, which conforms its request for relief to the recently acquired evidence as Exhibit 20.

Dated: June 16, 2021    Respectfully Submitted,

       **MARIO TRICOCI HAIR SALONS AND DAY SPAS, LLC d/b/a TRICOCI SALON AND SPA**

       By:  */s/ Laura Luisi*

        **Michael D. Karpeles**
        karpelesm@gtlaw.com
        **Laura Luisi**
        luisil@gtlaw.com
        Greenberg Traurig, LLP
        77 W. Wacker Drive, Suite 3100
        Chicago, IL 60601
        Tel: (312) 456-8400
        Firm I.D. No. 36511

        **Stephanie J. Quincy**

quincys@gtlaw.com
Greenberg Traurig, LLP
2375 E. Camelback Rd. Suite 700
Phoenix, AZ 85016
Tel: (602) 445 – 8506

*Attorneys for Mario Tricoci Hair Salons and Day Spas, LLC d/b/a Tricoci Salon and Spa*

<u>**CERTIFICATE OF SERVICE**</u>

I, Laura Luisi, certify that, on June 16, 2021, I served the foregoing **TRICOCI'S REPLY IN SUPPORT OF ITS AMENDED MOTION FOR PRELIMINARY INJUNCTION** on all counsel of record via the Court's ECF system.

*/s/ Laura Luisi*

One of Plaintiff's Attorneys

# Exhibit   1

## Catching up and needing your counsel.....

Claudia Poccia <claudiapoccia4@gmail.com>
Mon 4/29/2019 4:49 AM
To: Dan Floyd <dan@floydassoc.com>

📎 3 attachments (12 MB)
Innospec NED 49617-001 SPC.pdf; Tygrus Personal Care Presentation Draft 6.pdf; Scan_20190423_161324.pdf;

Hi Dan,

I am looking forward to our call tomorrow as I have so much to share and so much to consider before signing any binding contracts. As you predicted, everything is coming together now and it is time to reflect on each opportunity to decide the best fit(s) for the long term.

First, the Mario Tricoci consultancy is going well and I am presenting the business case to the Board on May 6th for a stand alone Beauty business that I might be able to run from NY. They are eager to grow that segment but it all comes down to resources and timing so, we shall see what that looks like beyond this consultancy period which , technically, concludes August 1. I don't anticipate that but it is the contractual agreement to date. I can fill you in live but I am enjoying them and making a positive impact.

### BOARD SEATS

1. **Innospec Inc-** I am in the final rounds on this and have to fly to Houston on May 5 th to meet the balance of the Board and go through the last round of interview. I have been through 2 rounds so far and am the finalist. They are conducting a security check on my background and checking my references right now; barring any unforeseen issues, that should go well. If I accept this, it will impact another opportunity which I will detail as well. I think Innospec is a big deal for me Dan, it is a big public company and the retainer is significant. The position specifications are attached for your review in advance of our call.

2. **LUXIE BEAUTY-** This one has taken a little longer as Conor wanted to clean up a few things between the Founders and also to ensure the distribution plans were locked before going public. He has proposed I come on now while it is still privately held as the Chairman of the Board and remain in that role once we go public on the Singapore stock exchange. There will be a road show before the listing and ,of course, I would be required to participate. The agreement is attached for your review as well. He wishes to lock this down this week but I wish for you and I to do the due diligence on all of these before we lock in.

3. **Tygrus-** This is the potential conflict with Innospec. It is a start up with a very unique ingredient story that will be sold to manufacturers of beauty products, the company construct is similar to Innospec as they have multiple classes of business that this innovation can be leveraged in. The difference is that I would start off as a consultant for a few days a week to help right the business plan and make introductions. Once we get the plan complete, the intent would be for me to be the CEO and raise funds as well operate the business unit. Documents attached for H30 which is what this division may be called.

Floyd_000016

4. **Skin Iceland-** This woman has asked me to be on her Board since the day she started but I couldn't because of Gurwitch, then Shiseido. It is a small company and a pure equity play. This could be a potential conflict with LUXIE at some point.

5. **Fredric Fekkai/ Bastide-** This began as an exploratory for a Board role but could morph into a consultancy of FT role; it is a direct conflict with Tricoci. I met Fredric a little over a week ago and await next steps re: any follow up from our meeting.

## FULL TIME EMPLOYMENT

I an in the initial candidate screening for a CEO role for a wellness company called WelleCo founded by Elle MacPherson in partnership with a PE firm out of Australia. Nothing has happened other than initial interview with search firm and now my credentials are being sent to the PE Group and Founder.


That's all of it for now Dan; much to think about as I want to make the right long term choices and set us up for the long term.

Looking forward to hearing your thoughts and recommendations.

Oh, forgot to ask, did our taxes get filed or did you file for an extension because of Richard's delayed documents?

Thanks and talk tomorrow!

Floyd_000017

Exhibit  2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Redacted

Redacted

# Redacted

MT-PocciaDevice_000002332

# Redacted

# Redacted

MT-PocciaDevice_000002334

# Redacted

# Redacted

# Redacted

# Redacted

Redacted

Redacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Redacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Redacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Redacted

MT-PocciaDevice_000002343

# Redacted

# Redacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Redacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Redacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Redacted

MT-PocciaDevice_000002348

Redacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit 3

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4    MARIO TRICOCI HAIR SALONS   )

5    & DAY SPAS, LLC d/b/a       )

6    Tricoci Salon and Spa, an   )

7    Illinois corporation,       )

8              Plaintiff,        )

9          vs.                   ) Case No. 20-cv-07196

10   CLAUDIA POCCIA and MOLLY    )

11   SLOAT,                      )

12             Defendants.       )

13

14

15      **CONTAINS ATTORNEYS' EYES ONLY TESTIMONY**

16         VIDEO DEPOSITION OF CLAUDIA POCCIA

17                 APPEARING REMOTELY

18

19                  June 11, 2021

20                  8:11 a.m. CDT

21

22   REPORTED BY:  WENDY A. KILLEN, CSR, RPR

23   LICENSE NO.:  084-003772

24   APPEARING REMOTELY

25

1  you the position?

2      A.    No, that is not my testimony.  Cornell

3  Capital is the primary investor in Blue Mistral.

4  Cornell Capital is also the company we were

5  pitching, my partner and I, to be the primary

6  investor in Ideavation.

7              I became associated and began to do

8  some advisory work for Cornell Capital.  That is how

9  the introduction to the concept of being on the

10 board of Blue Mistral came to be.

11     Q.    Had you had any discussions about being

12 involved with Fekkai prior to that time?

13     A.    No.  I did have discussions regarding

14 Ideavation and the construct of that business model

15 and outsourcing or back-of-the-house function with

16 some of the businesses that Cornell had invested in.

17     Q.    Do you think it's a conflict, the work

18 that you are now doing, for example, for Fekkai, and

19 what you were previously doing for MT?

20              And by MT, you know what I mean,

21 correct?

22     A.    I understand MT to be Mario Tricoci.

23     Q.    Correct.

24     A.    No.  At Mario Tricoci, I had a specific

25

1 role as an independent contractor to focus on

2 upgrading their current hair care line and beginning

3 development on new brands that would ultimately end

4 up in retail setting.

5          At Blue Mistral and on the board of

6 Blue Mistral, I have end-to-end oversight, in

7 partnership with Frederic Fekkai, of Bastide and

8 Frederic Fekkai.  It's end-to-end operation.  It's

9 financial accountability for the performance of the

10 business.  So it is a C -- it's a true CEO role

11 versus the independent contractor role of product

12 development and developing lines for retail, so

13 they're very different.

14     Q.    Because I am limited on time today, I'm

15 going to ask that you listen to my question, and you

16 answer it as directly as you can.

17          You do understand that your

18 deposition is limited to three hours today, correct?

19     A.    Correct.

20     Q.    Because we're not in the same room, we

21 have this unique challenge with video depositions.

22 I can usually see if the witness is looking at

23 anything or has any notes or anything like that.

24          Do you have a note pad or anything

25











1    chain such as Ulta?

2         A.    Yes.

3         Q.    That was one of your goals in working

4    with MT?

5         A.    In developing a line specifically for

6    retail, yes.  Phase one, update the core brand for

7    salon and website.  Phase two, develop a line for

8    retail and introduce Tricoci to Sephora, Ulta,

9    Bluemercury, Kohl's, Target, wherever we felt the

10   brand would fit, yes.

11        Q.    All right.  Let me ask you a few similar

12   questions about Fekkai, within Fekkai the brand.

13              Mr. Fekkai was a legendary stylist.

14   Would you agree with that?

15        A.    Is a legendary stylist, yes.

16        Q.    Had salons for a time in Florida and

17   New York, correct?

18        A.    Yes.

19        Q.    Did he ever have a geographic territory

20   beyond that?

21        A.    I don't know his salon business, but his

22   products are international and have had national

23   distribution.  I can't answer for that.  I wasn't

24   there.

25

1      A.    No, I did not.

2      Q.    You knew Molly was connected at Ulta?

3      A.    Yes.

4      MS. QUINCY:  Okay.  Next.  27, which

5 is...

6      MS. TURTCHIN:  I would say --

7      MS. QUINCY:  29?

8      MS. TURTCHIN:  I would say it's 29.

9      MS. QUINCY:  Yeah.

10     MS. LUISI:  25 for you, Colton.

11           (Whereupon, Deposition Exhibit

12           25 and 26 were marked for

13           identification.)

14     MR. LONG:  Okay.  We have it up.

15 BY MS. QUINCY:

16     Q.    Okay.  This is -- it appears you

17 were meeting with -- it says, subject:

18 Fekkai/Claudia/JC.

19         Is that who you met with that

20 evening?

21     A.    That morning.

22     Q.    That morning.

23         So you met with Mr. Fekkai.

24     A.    9:00 a.m., yes.  I met with Justine and

25

1    Frederic and I.  We had coffee because Justine and I

2    had met with Ulta the night before for dinner, and

3    we looked at org charts on Fekkai of the areas and

4    the people that would support Ideavation before

5    the -- before the Fekkai meeting.

6         Q.    Okay.  You wanted to clue Mr. Fekkai

7    in on how Ulta responded to the org chart for

8    Ideavation --

9         A.    No.

10        Q.    -- before his meeting with Ulta?

11        A.    No.  Justine from Cornell asked could I

12   look at them and let Frederic know which players and

13   which back office functions in finance, HR, supply

14   chain operations we would leverage because it would

15   be advantageous to their P&L as well because they

16   would be charging us for those services should

17   Ideavation get funded.

18        Q.    Okay.

19        A.    And Justine had oversight for both.  So

20   that was the content of the coffee.

21             MS. QUINCY:  Okay.  Exhibit 27 for you,

22   Colton.  Let me just get it.

23

24

25

1                    (Whereupon, Deposition Exhibit

2                    27 was marked for

3                    identification.)

4    BY MS. QUINCY:

5         Q.    Oh, your meeting -- your breakfast with

6    Mr. Fekkai was at the Langham Hotel?

7         A.    Correct.

8         Q.    In Downtown Chicago?

9         A.    It was -- it was -- it was coffee.

10        Q.    Kind of like drinks in L.A., but kind of

11   dinner?

12        A.    Really?

13        Q.    Exhibit 31.

14        A.    I'm sorry.  I'm confused.  I wasn't --

15   I'm sorry.  I'm confused.  Your question was about

16   breakfast, correct?

17        Q.    It was at the Langham Hotel in Downtown

18   Chicago, wasn't it?

19        A.    Yes.

20        Q.    Whether it was drinks, a donut, an

21   omelette, it was at a hotel in Downtown Chicago?

22        A.    Yes, absolutely.

23             MS. QUINCY:  Okay.  What exhibit number

24   are we on?

25

1             MS. LUISI:  27.

2    BY MS. QUINCY:

3         Q.    27.

4              And the only thing -- before we pop

5    this up, the only thing you were there to do was

6    promote Ideavation?

7         A.    Yes.  But I did sit in, by invitation, to

8    Frederic's meeting for a few minutes before I headed

9    off to the airport.

10             MS. QUINCY:  Okay.  Tell me when you've

11   got it up, Colton.

12             MR. LONG:  Talking about Exhibit 27?

13             MS. QUINCY:  Yes, 27.

14             Okay.  Sorry.  Okay.  Do you have it

15   up?  Make it stop.

16             Okay.  Is the exhibit up?

17             MR. LONG:  The exhibit is up.

18   BY MS. QUINCY:

19        Q.    Okay.  This is a note you sent to Jessica

20   Phillips at Ulta, correct?

21        A.    Yes, who I met that day.

22        Q.    And you sent it -- you had just met her.

23   You didn't have a relationship with her?

24        A.    No, I did not.

25

1    Q.    And what was her -- what's her role at

2    Ulta?

3    A.    She oversees hair care and bath and body.

4    Q.    Important person at Ulta?

5    A.    I just met her that day.  She is.

6    Q.    See if I read this correctly.

7              Hi, Jessica.  It was lovely to meet

8    you and your team.  I am just sorry I had to

9    slip out.  I had a preexisting board meeting in

10   San Francisco and the kick-off dinner was tonight.

11   I am normally not ill-mannered, and I hope you will

12   accept my apologies.

13             Did I read that correctly?

14   A.    Yes.

15   Q.    Okay.  Here's the part I really want to

16   talk to you about.

17             Hoping it went well and that there is

18   opportunity to create a Ulta/Fekkai movement in

19   clean salon hair care.

20             Did I read that correctly?

21   A.    Yes.  I was wishing them all well.

22   Q.    Did you -- were you working at that time

23   with Tricoci on clean salon hair care?

24   A.    Yes.  It's a big category in the

25

1  industry, and absolutely all brands need to clean up

2  their products in order to be competitive.  And,

3  yes, I was working with Tricoci so that they could

4  be competitive in retail.

5        Q.    Did you tell Tricoci that you had had --

6  you were working with Ulta on the opportunity to

7  create an Ulta/Fekkai movement in clean salon hair

8  care?

9              MR. LONG:  Object to form.  And, counsel,

10  I typically don't give speaking objections, but

11  that -- she already gave prior testimony on this and

12  multiple times made multiple statements, but...

13  BY MS. QUINCY:

14        Q.    You can answer.

15        A.    I just wished them well.  I wished Ulta

16  and Fekkai an opportunity to create a movement.  I

17  did not --

18        Q.    Did you tell anybody from Tricoci that

19  you did this?

20        A.    No.

21              MS. QUINCY:  33?  Did we do 33?  We did

22  33.  And I'm not sure -- it should be 29.  Did I

23  want to do the other one?  Do I want to do the other

24  one?  Yeah.  Actually, let's do the other one first.

25



1                 (Whereupon, Mr. Santiago and

2            Ms. Brinley exited the room.)

1      A.    A --

2      Q.    You were not brought in to help the

3  Fekkai product line --

4      A.    I was --

5      Q.    -- become profitable?

6      A.    I was -- I was brought in to help Blue

7  Mistral, the company and the entity, become

8  profitable.

9      Q.    Okay.  And when it --

10     A.    It was two brands.

11     Q.    Bastide and Fekkai, correct?

12     A.    Correct.

13     Q.    At the time you were brought in as acting

14  CEO, were either of those lines profitable, Bastide

15  or Fekkai?

16     A.    In June of 2020, when I joined the board,

17  Fekkai was not profitable.  Blue Mistral was not

18  profitable.  I can't answer on Bastide.  It's such a

19  small business, it was buried in the financials, but

20  it wouldn't have been big enough or material enough

21  to make a difference in the overall company

22  performance.

23     Q.    Okay.  Were you ever out of the Fekkai

24  hair brand and just working with Bastide at any time

25

1    since you've been brought on?

2         A.    In April, I did the Bastide strategy.

3    The brand was in market already.  And I grew up in

4    the fragrance business.  That's where I started my

5    career.  So I started looking at Bastide and the

6    Bastide strategy.  And that was the first actual

7    real project work that I had done for Blue Mistral.

8    Prior to that, it was really assessing the structure

9    of the back offices and the quality of the people in

10   those roles to support Ideavation.

11        Q.    Okay.  Since November of 2020, have you

12   had involvement with the Fekkai product line?

13        A.    Not direct.  I have oversight as the CEO,

14   but there is a senior vice president of product

15   development who works directly with Mr. Fekkai and

16   the lab, and she has someone that reports into her

17   as well.

18        Q.    Does she report to you?

19        A.    Yes, she does.

20        Q.    You're the CEO?

21        A.    I am the acting -- I am a -- I want to

22   make this clear.  I am not the CEO of Blue Mistral.

23   I am an independent contractor.  My role is -- as a

24   board member is in an acting role assisting Frederic

25

1      BY MS. QUINCY:

2          Q.    Yeah.  You got some other benefits other

3      than just working with people who you liked?

4          A.    Are you asking me if I was paid for my

5      services?

6          Q.    Well, let's go through a couple things.

7                    You were paid $30,000 a month,

8      correct?

9          A.    Yes.  I reduced my fee in order to work

10     with the Tricocis.

11         Q.    What do you normally get?

12         A.    I normally get 3,500 to 4,000, but Chris

13     Santiago had asked me if I would consider reducing

14     it.  I said that I would reduce my daily rate if we

15     had an agreement.  So we landed on 10 -- $3,000 a

16     day, 30,000 a month, and that's how we negotiated

17     it.

18                    So if your answer was was I paid --

19     your question was was I paid for my services, yes, I

20     was.

21         Q.    This also gave you a much deeper dive

22     into hair care, did it not?

23         A.    Hands-on experience, yes, but I had

24     experience in hair care through my position as

25

1    president of Avon U.S. Beauty and also during my

2    tenure at Estee Lauder.  The acquisition of Bumble &

3    Bumble and Aveda gave me access to hair care through

4    Michael Gordon, the founder, and Horst, the founder

5    of Aveda, but I did not have hands-on experience in

6    the day-to-day until this assignment.

7         Q.    And as we've seen in the note that you

8    sent to Dan Floyd, it also potentially gave you the

9    opportunity to be the CEO of a beauty brand sitting

10   in New York, correct?

11             MR. LONG:  Object to form.

12             THE WITNESS:  I had already been a CEO of

13   a beauty brand sitting in New York.  I'm not sure

14   what you're asking here.

15   BY MS. QUINCY:

16        Q.    I'm just referencing the e-mail you sent

17   to Dan Floyd that said one of the opportunities you

18   saw with the Tricoci situation was to be able to run

19   independently the beauty brand as the CEO in

20   New York.

21             MR. LONG:  Object to form.

22             Counsel, do you want to actually go

23   to that document to talk about it?

24             MS. QUINCY:  No, I don't, because that

25

Exhibit   4

Page 1

1       IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

4   MARIO TRICOCI HAIR SALONS  )

5   & DAY SPAS, LLC d/b/a       )

6   Tricoci Salon and Spa, an  )

7   Illinois corporation,      )

8           Plaintiff,      )

9       vs.                 ) Case No. 20-cv-07196

10   CLAUDIA POCCIA and MOLLY   )

11   SLOAT,                     )

12           Defendants.     )

13

14

15     **CONTAINS ATTORNEYS' EYES ONLY TESTIMONY**

16       VIDEO DEPOSITION OF JOSEPH SANTACROCE

17              APPEARING REMOTELY

18

19                  June 15, 2021

20                  8:39 a.m. CDT

21

22   REPORTED BY:  WENDY A. KILLEN, CSR, RPR

23   LICENSE NO.:  084-003772

24   APPEARING REMOTELY

25

1    associated in your mind with what constitutes a

2    prestige realtor -- or realtor -- prestige beauty

3    brand?

4         A.    I do not know.

5              MS. CORTEZ:  Objection to the --

6              THE WITNESS:  Yeah.

7              MS. CORTEZ:  So let me just get the

8    objection.  Objection to the form of the question.

9                   Okay.  You can proceed.

10   BY MS. QUINCY:

11        Q.    Who do you consider your competitors to

12   be?

13        A.    In finance and accounting, we don't look

14   at competitors.  We do the actuals, we look at our

15   budget, and we compare ourselves to ourselves.

16        Q.    So if I asked you, for example, to list

17   five other companies that you would consider to be

18   competitors of Fekkai in the product space, could

19   you name them?

20        A.    I couldn't because that's not the nature

21   of my job.

22        Q.    Do you know of any companies that are

23   currently working to get into the prestige beauty

24   space?

25

1    1         A.    No.  It's not the nature of my role in my

2    2    industry.

3    3         Q.    Okay.  Is Fekkai currently selling in

4    4    Walmart, CVS, Walgreens, or grocery stores?

5    5         A.    I really --

6    6              MS. CORTEZ:  Objection to the form of the

7    7    question.

8    8    BY MS. QUINCY:

9    9         Q.    You can answer.

10   10        A.    When I joined the company in March of

11   11    2019, we were.  We no longer are.

12   12        Q.    When did that take place?

13   13        A.    That ended at 2020.

14   14        Q.    Do you work on the Bastide segment of the

15   15    Fekkai business?

16   16        A.    I do the finance and accounting for

17   17    Bastide as well.

18   18        Q.    Are you present in any meetings where

19   19    competitors are discussed?

20   20        A.    No.  I'm only in finance and accounting,

21   21    any numbers in meetings.

22   22        Q.    What about strategy, are you in sessions

23   23    that discuss the strategy of the Fekkai product line

24   24    with regard to, for example, gaining market share

25

1    business again, and I learned the strategy of that

2    line that was in Ulta.  And the strategy was being

3    discussed, but I wasn't involved with that at the

4    time.  As you mentioned, there was a CFO.  And my

5    main focus was, as the controller, handling the

6    finance and accounting for the business.

7         Q.    Okay.  What lines or products were in

8    Ulta in 2019?

9         A.    The product line was referred to as

10   The One by Frederic Fekkai.

11        Q.    Is that product line still in existence?

12        A.    It still exists.  The partners that we

13   sell to have changed.

14        Q.    Is The One still being manufactured?

15        A.    No.

16        Q.    Is the goal to finish all retail sales of

17   that product and no longer focus on it?

18        A.    I'm not involved with the final strategy,

19   but, yes, I believe that is the main focus.

20        Q.    I'm trying to keep all of -- we have

21   certain documents in this case that have been

22   designated as attorneys' eyes only, meaning my

23   clients cannot see them, so there's some questions I

24   want to ask you, but one of the documents is AEO, so

25

1    record.  The time is 9:14 a.m.

2                    (Whereupon, a break was taken.)

3             THE VIDEOGRAPHER:  We are back on the

4    record.  The time is 9:23 a.m.  Please proceed.

5    BY MS. QUINCY:

6         Q.   Mr. SantaCroce, I want to apologize.

7    I believe what you were referring to is the

8    Attachment B to your affidavit, which is the e-mail

9    that you sent in response to Ms. Poccia's e-mail, is

10   that correct?

11        A.   Yes.

12        Q.   Okay.  It is, however, different than

13   Exhibit 2.  Would you agree with that?

14             MR. LONG:  Object to form.

15             THE WITNESS:  Yes.

16   BY MS. QUINCY:

17        Q.   Okay.  The One, does -- I believe you

18   said that product is no longer -- that product line

19   is no longer manufactured.

20             Has it been replaced with something?

21        A.   The One was the product line sold at Ulta

22   from 2017 that has since been stopped in production.

23   We have a new Fekkai product line that launched in

24   2019.

25







20    20            MS. QUINCY:  Exhibit 16, Sid, I think
21    21    that's number -- are we at 5?
22    22                        (Whereupon, Deposition Exhibit 5
23    23                        was marked for identification.)
24    24            MS. CORTEZ:  Before you move on, I just
25

1    how often -- her hours and full-time status.  I knew

2    she was working for the brand and instructed to pay

3    her invoice.

4    BY MS. QUINCY:

5         Q.    Okay.  She was paid $35,000 a month, is

6    that correct?

7         A.    According to this exhibit, that's what

8    her base fee was for September.

9         Q.    Was there any time where Ms. Poccia was

10    unavailable to you?

11              MR. LONG:  Object to form.

12              MS. CORTEZ:  Objection to form.

13              THE WITNESS:  I don't recall.  Our

14    communication was via e-mail, so there could be --

15    there were delays with e-mails.  We had set times to

16    speak to catch up on any business-related items.

17    BY MS. QUINCY:

18         Q.    Okay.  Do you know when Fekkai 3.0

19    launched?

20         A.    Fekkai 3.0 officially launched in January

21    of 2020.

22         Q.    Where was the launch?

23              Was there a launch party or something

24    like that?

25

1     A.    I -- finance and accounting is not

2     involved with launch parties or launch events.  It

3     launched on -- to finish your question, it launched

4     on our dot-com and Target in January of 2020.

5          Q.    Do you know of the launch event that took

6     place in California in the Los Angeles area in

7     January of 2020?

8               MR. LONG:  Object to form.

9               THE WITNESS:  I knew there was an event.

10    I was not involved.  I was not there.  I, once

11    again, just handled the finance and accounting items

12    related to the event.

13    BY MS. QUINCY:

14         Q.    Do you know whether or not Ms. Poccia was

15    at that event?

16         A.    I do not.

17              MS. CORTEZ:  Objection to the form.

18    BY MS. QUINCY:

19         Q.    Do you know who developed Fekkai 3.0, who

20    was involved in that?

21         A.    I am not involved with new product

22    development.  When I joined in March of 2019, the

23    process was already well underway.

24         Q.    Do you know when 3.0 launched at Ulta?

25

1          A.    3.0 was on Ulta's dot-com last summer and

2     launched in-store at the end of the summer 2020.

3          Q.    Can you tell me what end of summer means

4     to you?  It means different things to different

5     people.

6          A.    Oh, I apologize.  My timing, I believe it

7     was August, September -- I believe it was in

8     September.

9          Q.    Of 2020?

10          A.    September 2020 for in-store.

11          Q.    I know it was COVID, but was there a

12     launch party of some sort?

13          A.    Not that I recall.

14          Q.    Okay.  When did the dot-com launch?

15          A.    As I stated, I believe it was April --

16     April or May timing of 2020.

17          Q.    Okay.  If you would look at --

18               MS. QUINCY:  Sid, could you pop 26, which

19     I believe is Exhibit 8.

20                         (Whereupon, Deposition Exhibit 8

21                         was marked for identification.)

22               THE WITNESS:  Okay.  I read the document.

23     BY MS. QUINCY:

24          Q.    Okay.  This is an e-mail from Ms. Poccia

25

1          THE WITNESS:  I would -- yes, I would

2     agree that we were running at a loss, which our

3     financial statements will show, and we had funding

4     and backing by private equity.

5     BY MS. QUINCY:

6          Q.    Perfect.

7               At any time that you worked with

8     Fekkai, has Fekkai been running at a profit?

9          A.    Which specific timeframes that I've been

10    working for Fekkai are you referring to?

11         Q.    The most recent.

12         A.    No.  Since March of 2019, we have not

13    been running at a profit.

14              MS. QUINCY:  Okay.  Sid, if you would do

15    141, please.

16                   (Whereupon, Deposition Exhibit

17                   11 was marked for

18                   identification.)

19              MS. QUINCY:  This is 11?

20              MS. LUISI:  I believe so, yes.

21              MS. QUINCY:  248766.

22              THE WITNESS:  I have the document up.

23    I'm going to read through it.

24

25

Exhibit  5



On 3/23/19, 10:45 AM, "Claudia Poccia" <CPoccia@tricoci.com> wrote:

Hi Chris,

Am putting finishing touches on this today and wanted you to take a look and advise if this will deliver your objective for leadership meeting.

Claudia

CONFIDENTIAL

Redacted

# Redacted

MT-Tricoci_00000644

# Redacted

Redacted

# Redacted

# Redacted

# Redacted

CONFIDENTIAL

Redacted

# Redacted

Redacted

Redacted

MT-Tricoci_00000653

Redacted

Exhibit   6

| From: | Claudia Poccia [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E08848F3A5E446B0A741C7AF99739FB5-CLAUDIA POC] |
|---|---|
| Sent: | 4/7/2019 11:58:57 AM |
| To: | Chris Santiago Blueroad [csantiago@blueroadventures.com] |
| Subject: | 2018 PCR Salon Industry Study - Table of Contents - Pricing - 2018.docx |
| Attachments: | 2018 PCR Salon Industry Study - Table of Contents - Pricing - 2018.docx; ATT00001.txt |

Hi There,

I got this quote for the Salon Industry data; I think between this and one from Kline we will have what we need for the hair category across retail and salon segments.

Ok to move forward on this? Will negotiate with Kline tomorrow.

MT-Tricoci_00000757

Exhibit 7

| From: | Claudia Poccia [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E08848F3A5E446B0A741C7AF99739FB5-CLAUDIA POC] |
|---|---|
| Sent: | 5/7/2019 12:11:40 PM |
| To: | Jack Harrington [jharrington@blueroadventures.com] |
| CC: | Chris Santiago Blueroad [csantiago@blueroadventures.com] |
| Subject: | Re: Project needs |

Hi Jack,

First and foremost,

Thank you for all the heavy lifting.

The next thing will be to look at the Excel Spread sheet that Kline sent us which gives specialty retail store data ( Ulta/ Sephora etc). Like you did the pricing , let's line them up by volume in hair, # of Doors. And add a column for Brands carried from our list of top brands.

Also, can you do a little research on Amika ( positioning , pricing, distribution)

I will call you on some next steps on CPG strategy framework and layout.


Sent from my iPhone, please excuse any auto correct errors

On May 7, 2019, at 11:52 AM, Jack Harrington <jharrington@blueroadventures.com> wrote:

Hi Chris and Claudia,

I was wondering if either you have anything you would like me to be working on. I have updated all of the project trackers and added them to our dropbox, as well as a few other housekeeping items, but now I am looking for some direction as to where I should focus my energy.

Thanks,
Jack Harrington
Analyst Intern



180 N Stetson Ave, Suite 2880
Chicago, IL 60601
Mobile: (978) 273-1964

Exhibit   8

| **From:** | Claudia Poccia [claudiapoccia4@gmail.com] |
|---|---|
| **Sent:** | 5/5/2019 5:41:30 AM |
| **To:** | Jack Harrington [JHarrington@tricoci.com] |
| **CC:** | Chris Santiago [CSantiago@tricoci.com] |
| **Subject:** | For Prestige retail sizing in next round after board meeting |
| **Attachments:** | Professional Hair Care Retailing-Table 3D-2 Leading Specialty Stores (1).xls |

# Professional Hair Care Retailing: United States Channel Analysis and Opportunities

Data download from MyKline (http://www.mykline.com)
Created for Brian Haas, Kline KMR Sales Team & Industry Managers. IP Address: 63.86.147.8

## Table 3D-2: Leading Specialty Stores that Offer Salon Hair Care Ranked by Sales and Store Counts in the United States, 2017

| Retailer | $ Million- | Approximate store count |
|---|---|---|
| Ulta | 5,300 | 1,034 |
| Sephora-b | 3,500 | 362 |
| Sally Beauty-c | 261 | 2833 |
| Bluemercury-d | 236 | 137 |
| Harmon Discount-e | 114 | 57 |
| Aveda | 107 | 125 |
| Planet Beauty | 80 | 40 |
| Beauty Brands | 75 | 58 |
| Ricky's NYC | 40 | 27 |
| Cos Bar | 35 | 20 |
| Space.NK-f | 16 | 8 |
| Beauty Collection | 10 | 5 |
| Peninsula Beauty | 5 | 3 |
| Credo | 3 | 6 |
| All other | 1,300 | 250 |
| **Total** | **11,081** | **4,965** |

a- Sales through the Internet are not included.    b- Does

Source: Kline
Published in: Professional Hair Care Retailing: United States Channel Analysis and Opportunities
© Kline & Company, 1959-2019

Exhibit   9

CTRL0000479558

Exhibit  10

# Redacted

ATTORNEYS' EYES ONLY

COMPETITOR CONFIDENTIAL

Exhibit  11

**From:** Claudia Poccia [CPoccia@tricoci.com]
**Sent:** 1/13/2020 9:10:59 PM
**To:** Chris Santiago [CSantiago@tricoci.com]
**Subject:** Re: ulta

My pleasure

Claudia Poccia
President, Hair & Beauty Products



273 E. Helen Road
Palatine, IL 60067
(917)683 0582
cpoccia@tricoci.com

On Jan 13, 2020, at 10:06 PM, Chris Santiago <CSantiago@tricoci.com> wrote:

This is perfect -thanks

**From:** Claudia Poccia <CPoccia@tricoci.com>
**Date:** Monday, January 13, 2020 at 9:01 PM
**To:** Chris Santiago <CSantiago@tricoci.com>
**Subject:** Re: ulta

Monica Arnaudo, Chief Merchandising Officer; I also know Dave Kimball ,President
Monica already knows about us; waiting for me to come in with final brand concept to pitch, volume projections etc.  If you recall, Board had said to launch in salon first then reach out.  Happy to facilitate as she knows I was going to pitch them.

Claudia Poccia
President, Hair & Beauty Products
<image001.png>

273 E. Helen Road
Palatine, IL 60067
(917)683 0582
cpoccia@tricoci.com

On Jan 13, 2020, at 9:58 PM, Chris Santiago <CSantiago@tricoci.com> wrote:

Hi – who is your contact at Ulta (position wise etc..).  Scott is considering reaching out to SVP of merchandising.   It may make more sense to continue through your relationship.    Welcome your thoughts.

Thanks

CTRL0000526052

# Exhibit 12

| **From**: | Claudia Poccia [cpoccia@tricoci.com] |
|---|---|
| **Sent**: | 2/19/2020 12:53:09 PM |
| **To**: | Chris Santiago [csantiago@tricoci.com]; Howard Silverman [hss@agmanpartners.com]; Mario Tricoci [mario@aparium.com]; Traci Tricoci [tracitricoci@gmail.com]; Cheryl Tricoci [ctricoci@aol.com] |
| **Subject**: | Fwd: WWD Beauty CEO Summit |

Hello from London!

I think this would be a great opportunity to get visibility for Tricoci; particularly as we begin to pitch Ulta and to enter into CRE Beauty Awards for 2020. I would suggest Transforming Mist.

Thoughts?

Claudia

**Claudia Poccia**
President, Hair & Beauty Product

273 Helen Road
Palatine, IL 60067
(917) 683 0582
cpoccia@tricoci.com

Sent from my iPhone, please excuse any auto correct errors

Begin forwarded message:

**From:** Marina Le Goff <mlegoff@wwd.com>
**Date:** February 19, 2020 at 4:32:09 PM GMT
**To:** WWD Events <wwdevents@wwd.com>
**Subject: WWD Beauty CEO Summit**

Hi,

We are looking forward to seeing you at The Ritz Carlton, Key Biscayne in Miami from May 11th-13th for our Beauty CEO Summit! We are reaching out to invite you to participate in the exclusive summit gift bag that will be given to each attendee at the conclusion of the summit. As you know, this is a high level, exclusive event consisting of executives from brands around the world, and the products within the bag express the same level of quality.

Should you be interested in participating, here are some requirements below:

**Guidelines:**
- Quantity required: 375
- Value: $100 minimum per bag per item (each individual item must reach $100)
- Gifts cards are encouraged
- No sample sized items permitted
- No discount gift cards permitted (i.e. $100 off purchase of $500+)
- Participating brands will need to send a sample product to WWD office or send a photo WITH PACKAGING.
- Once approved, we will need products by 4/20 to warehouse

Happy to answer any questions you may have! Please email me directly if you are interested in participating.

We look forward to seeing you in Miami in May!

Best,
Marina

Marina Le Goff
Client Services Coordinator
WWD | Fairchild Live
475 5th Avenue, New York, NY 10017
P: 646-356-4726
mlegoff@wwd.com

MT-PocciaDevice_000001910

# Exhibit 13

# Redacted

ATTORNEYS' EYES ONLY

# Redacted

ATTORNEYS' EYES ONLY

CTRL0000244809

Exhibit  14

| From: | Claudia Poccia [pocciaclaudia@icloud.com] |
| --- | --- |
| on behalf of | Claudia Poccia <pocciaclaudia@icloud.com> [pocciaclaudia@icloud.com] |
| Sent: | 3/5/2020 12:55:52 AM |
| To: | JPhillips@ulta.com |
| Subject: | SO SORRY |

Hi Jessica,

It was lovely to meet you and your team; I am just sorry I had to slip out. I had a pre-existing Board meeting in SF and the kick off dinner was tonight. I am normally not ill mannered and I hope you will accept my apologies.

Hoping it went well and that there is opportunity to create a ULTA/FEKKAI movement in clean, salon haircare.

Sending best regards,

Claudia


Sent from my iPhone, please excuse any auto correct errors

Exhibit  15

# Redacted

ATTORNEYS' EYES ONLY

# Redacted

ATTORNEYS' EYES ONLY

Redacted

ATTORNEYS' EYES ONLY

# Redacted

ATTORNEYS' EYES ONLY

# Exhibit  16

| From: | Claudia Poccia [claudiapoccia4@gmail.com] |
|---|---|
| on behalf of | Claudia Poccia <claudiapoccia4@gmail.com> [claudiapoccia4@gmail.com] |
| Sent: | 7/9/2020 1:55:44 PM |
| To: | Chris Santiago [CSantiago@tricoci.com] |
| Subject: | Job Description |
| Attachments: | Job Description-Manager Project Management-NPD.docx; ATT00002.bin; image002.png; ATT00004.bin |

Hi Chris,

Always great to catch up with you and I do look forward to continuing to collaborate with you and the entire Tricoci team in a manner that can benefit all!  On a short term basis, if there are any calls/kick off projects/ transition work that you need we can certainly make that happen and I would offer a reduced rate of $350.00 per hour for these short term items.    Also, I don't believe in " nickel and diming" a good partner and therefore wish to let you know that am happy to jump on a quick call at any time, no fee, just wish to make sure we transition well.  The relationship is what matters most to me.

Below is a job description which I think might be helpful as you refine the scope of the project management portion of Roxann's former role. Might have some useful nuggets for you.

I will keep you informed once the ink is dry on our project as am anxious to share.

Best,


Claudia

Manager, Project Management (NPD)

Position Summary

Scope and Responsibilities

By coordinating all Product Development tasks for specific products / lines, you will insure that the regional organizations supply our customers with new innovative products on time and in full, at the targeted KPI's and quality levels at the quickest speed to market within the industry.

The team in the NPD organization will lead the quality interface between all business functions ensuring the continuous improvement in all aspects of the development process for each brand.

Specific Responsibilities

•Lead the new product development process for specific products for a designated brand from concept generation to execution, ensuring timing, quantity and KPI's targets are achieved.

•Identify underlying weak processes, systems and/or people and establish objective driven improvement action plans that create an environment of continuous improvement in all work processes.

•Establish and maintain an 12-month new product development calendar in conjunction with the brand and proactively drive the "Kick off" briefing process using a range of standard time plan templates that vary in duration according to product complexity.

•Consistently challenge and reduce the development lead-times by ensuring appropriate balanced risks are built into the original time plans, whilst ensuring all COG, quality and service requirements are achieved/exceeded.

•Ensure the creative process is optimized to enable quick and efficient funneling from concept generation through feasibility to execution ensuring the supply chain group is engaged at the earliest appropriate opportunity.

•Define and agree upon detailed time plans for each project with key development milestones and also proactively track and manage their adherence.

•Ensure information is forwarded in a timely manner and made more accurate all along the development process e.g. Specifications, BOM's, Quantities, Shipping plans.

•Manage the timely and effective communication of the risks and corrective actions required to ensure perfect execution and encourage an environment of full transparency via the use of a "Weather Chart", project meeting action plans, "Critical Issue/Red flag" alerts to senior management and other similar tools.

•Ensure the accountability /ownership and the workflows of all NPD process steps are agreed and understood.

•Ensure clear processes are in place and agreed for managing project and resource prioritization.

•Proactive cost/Gross margin management at all stages of NPD ensuring value analysis established as an integral part of the NPD process.

•Lead the process of SKU life cycle management through highly efficient product portfolio management.

•Lead and coordinate the Bill of Material (BOM) process for all new products ensuring accuracy and minimum rework.

•Lead the demand plan/PSI/RPI process. Create the demand plan for all new launches by country and manage

the formal handover to the production-planning group to initiate the PSI/RPI process.

•Approve/challenge the parameters of the receipt, production and inventory plans for finished goods, WIPS and Materials created by the Production planning department to ensure inventory windows and service levels are maintained during the launch period of 3 months.

•Review and manage forecast transmission and fluctuations in sales/forecast at SKU level during the launch period.

•Formalize and agree the appropriate planning parameters with production planning to ensure the effective transfer of SKU's from "launch status" managed by NPD planning to "replenishment status" managed by Production Planning.

•Ensure appropriate KPI's are in place and used effectively to measure and improve the effectiveness of the key elements of NPD process and overall departmental performance.

Qualifications

•Innovation driven- in tune with today's fast paced makeup market and can drive concept and innovation that's ahead of the trends

•Strong ability to generate creative and realistic solutions in a time sensitive manner

•Collaborative and partners with cross-functional (including Pkg, Creative, Global Mktg.) teams to lead initiatives

•Minimum of 5+ years beauty product development experience

•4 year degree is required (ideally in Marketing); an MBA is a plus

•Proficient in Excel, Word and PowerPoint

•Strong communication skills (written and oral) with an high level of business urgency

Exhibit 17

| From: | Claudia Poccia [claudiapoccia4@gmail.com] |
| --- | --- |
| on behalf of | Claudia Poccia <claudiapoccia4@gmail.com> [claudiapoccia4@gmail.com] |
| Sent: | 6/10/2020 8:44:34 AM |
| To: | Justine Cheng [Justine@cornellcapllc.com] |
| CC: | Frederic Fekkai [frederic@fekkai.com]; Joanna Coles [colesjoanna@gmail.com]; Heather Passaro [joanna@joannacoles.com] |
| Subject: | Re: Molly Sloat cv and samples |

She would LOVE to be a part of this and sitting in Chicago  be ideal because of proximity to ULTA .

Claudia Poccia
Co-Founder & CEO
DragonflySage Corp.
claudiapoccia4@gmail.com
(917) 683 0532

Sent from my iPhone, please excuse any auto correct errors


On Jun 10, 2020, at 8:46 AM, Justine Cheng <Justine@cornellcapllc.com> wrote:


Looks super talented.

What would we have to pay to bring her on? And how would her role be vs marion?

We have an office she can sit in downtown chicago too.


**From:** Claudia Poccia <claudiapoccia4@gmail.com>
**Sent:** Wednesday, June 10, 2020 7:47 AM
**To:** Justine Cheng; Frederic Fekkai
**Cc:** Joanna Coles; Heather Passaro
**Subject:** Molly Sloat cv and samples

Hi Justine ad Frederic,

Below is the work of Molly Sloat who use to be the Creative/Marketing/PD  leader of ULTA  private label ; we have been working together on the Tricoci rebranding and she has done the Joanna Gaines concepts.  She is the person Joanna and I introduced to Henry and Ann for our lead Marketing/Creative resource for Ideavation.  She knows ULTA inside &out and resides in Chicago; she would be an exceptional  addition to the team, perhaps freelance at this juncture but she could definitely get us set up for success @ ULTA on all brands in the portfolio.

Would love your thoughts.


Begin forwarded message:

**From:** Molly Sloat <molly@designdichotomy.com>
**Subject: cv and samples**

CP-
here is all of my work! I realize it's way too much - would welcome your thoughts helping to edit down or let me know what you think is relevant?
I hope you, richard and dolce are great,
let's talk tomorrow- xx

This email and any attachments transmitted with it are confidential and intended only for the person or entity to whom they are addressed. If you are not the intended recipient, your review, dissemination, distribution, copying or other use of this information is strictly prohibited. If you have received this email in error, please immediately contact the sender and delete it from your system.

# Exhibit  18

Redacted

# Redacted

# Exhibit  19

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIO TRICOCI HAIR SALONS & DAY SPAS, LLC d/b/a Tricoci Salon and Spa, an Illinois corporation, | ) ) ) | |
| | ) | Case No. 20-cv-07196 |
| Plaintiff, | ) | |
| | ) | Honorable Matthew F. Kennelly |
| v. | ) | |
| | ) | Hon. Mag. Gabriel A. Fuentes |
| CLAUDIA POCCIA and MOLLY SLOAT, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF ANDY SPORE

I, Andy Spore, being first duly sworn under oath, depose and state as follows:

1.      I am over the age of eighteen.

2.      I am currently employed at Legility, LLC as a Senior Digital Forensic Examiner.

3.      I have reviewed the document attached hereto as Exhibit 1 and identified as "MT-PocciaDevice_000007490 – 7565", which I understand was publicly filed on April 19, 2021, by Plaintiff as Exhibit 64 in support of Plaintiff's Amended Motion for Preliminary Injunction and again on June 1 as part of Defendant Claudia Poccia's ("Poccia") Response to Plaintiff's Amended Motion for Preliminary Injunction.

4.      MT-PocciaDevice_000007490 – 7565 is a recovered deleted and fragmented file, which means that it was at some point deleted and subsequently partially overwritten with data from newer files or computer processes. The files were recovered through a process called "file carving."

5. The e-mail at MT-PocciaDevice_000007490 – 7565 visually depicts in the Relativity database that there is a document attached to the e-mail entitled "December 2019 S&OP Meeting see slide 7 Mario Product.pptx."

6. I discussed this document with Plaintiff's counsel on April 30, 2021, when they asked me to confirm that the document had been deleted at some point, whether Legility was able to piece it back together, and whether it contained the attachment entitled "December 2019 S&OP Meeting see slide 7 Mario Product.pptx."

7. After forensic review of the document and its metadata, I determined that it had been deleted and was "carved" (*i.e.* recovered and pieced together) from deleted space on the computer's hard drive. I explained to Plaintiff's counsel that carved files may contain peculiarities in the way the fragmented files are pieced back together and visually displayed. In certain instances, recovered deleted e-mails originally including attachments may be pieced back together in such a way that indication of an attachment does not appear in the typical field in the Relativity platform which indicates the presence of attachments. This is not uncommon when recovering deleted data.

8. I informed Plaintiff's counsel that I could not determine with certainty whether the attachment entitled "December 2019 S&OP Meeting see slide 7 Mario Product.pptx" was attached to the e-mail identified as MT-PocciaDevice_000007490 – 7565, but that, based on the presentation of the metadata and the fact that it was deleted and subsequently carved, there was a possibility that it was.

9. On May 25, 2021 Poccia's counsel asked me to conduct further forensic analysis on the fragmented e-mail identified as MT-PocciaDevice_000007490 – 7565. Upon performing further analysis and research into the non-fragmented e-mail header data present in the e-mail, I

revised my initial assessment and determined that the e-mail identified as MT-PocciaDevice_000007490 − 7565 most likely did not contain the attachment "December 2019 S&OP Meeting see slide 7 Mario Product.pptx". Once I reached my revised conclusion, I did not inform Plaintiff's counsel.

10. Furthermore, while I determined there is a likelihood that the document entitled "December 2019 S&OP Meeting see slide 7 Mario Product.pptx" was not originally part of the e-mail identified as MT-PocciaDevice_000007490 − 7565, I am not able to make that assessment with absolute certainty because the file was at some point deleted, and the file data is partially overwritten and fragmented. Had it not been deleted, I would be able to state with certainty whether the e-mail identified as MT-PocciaDevice_000007490 − 7565 contained attachments.

FURTHER AFFIANT SAYETH NOT

*Andy Spore*
Andy Spore (Jun 6, 2021 20:48 CDT)

Andy Spore
Sr. Digital Forensic Examiner
Legility

# Exhibit    1

| **From**: | Joseph Santacroce [jsantacroce@fekkai.com] |
| **Sent**: | 10/20/2020 2:09:23 PM |
| **To**: | Claudia Poccia [cpoccia@fekkai.com] |
| **Subject**: | RE: For your eyes only |

Exhibit 20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MARIO TRICOCI HAIR SALONS     )
DAY SPAS, LLC d/b/a Tricoci Salon and     )
Spa, an Illinois corporation,     )
                              )     Case No. 20-cv-07196
          Plaintiff,     )
                              )     Honorable Matthew F. Kennelly
        v.     )
                              )     Hon. Mag. Gabriel A. Fuentes
CLAUDIA POCCIA and MOLLY SLOAT, )
                              )
          Defendants.     )

## [PROPOSED] AGREED
## ORDER FOR PRELIMINARY INJUNCTION

This cause coming to be heard on Mario Tricoci Hair Salons & Day Spas, LLC d/b/a

Tricoci Salon and Spa's ("**Tricoci**") Amended Motion for Preliminary Injunction (the "**Motion**"),

due notice having been given, and the Court being fully advised in the premises, in order to protect

Tricoci's business interest:

        A.      Defendants Poccia and Sloat are enjoined and restrained from using, disclosing, misappropriating, relying on, copying, or transferring Tricoci's information in their possession, custody or control;

        B.      Defendants Poccia and Sloat must return to Tricoci any and all Tricoci information to the extent any is within their possession, custody, or control, including, but not limited to, any and all copies or reproductions of any document, communication or tangible item that contains any Tricoci information currently in the possession, custody, or control of Poccia, or anyone authorized to act on her behalf within 7 days of entry of this order.

        C.      Defendants Poccia and Sloat must destroy any and all Tricoci information, including, but not limited to, any and all copies or reproductions of any document, communication or tangible item that contains any Tricoci information currently in the possession, custody, or control of Poccia or Sloat, or anyone authorized to act on their behalf. To accomplish this destruction, Tricoci and Ms. Poccia/Ms. Sloat must meet and confer within seven (7) days from the date of this order and agree on a third-party vendor to perform the actions set forth above. The parties must then deliver a status report within ten (10) days from the date of this order that sets forth the vendor selected, the procedures for identifying such information, and the timeframe for accomplishing destruction of such information, with such timeframe not to exceed thirty (30) days

from the date of this order. Such efforts will be at Defendants' expense;

      D.     Alternative A. Defendants Poccia and Sloat are enjoined and restrained from being directly or indirectly being involved, in any manner, in the management, performance of work, or direction of any hair care product for Fekkai until December 31, 2022

           Alternative B. Defendants Poccia and Sloat are enjoined and restrained from directly or indirectly being involved, in any manner, in the relationship between Fekkai and ULTA until December 31, 2022; and

      E.     Defendants Poccia and Sloat are enjoined and restrained from directly or indirectly soliciting or inducing or attempting to solicit or induce any employee of Tricoci to leave the employment of Tricoci until December 31, 2022.


Dated:_____, 2021                 _____

                              Honorable Matthew F. Kennelly

*Prepared by:*
GREENBERG TRAURIG, LLP (#36511)
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
*Attorneys for Plaintiff Mario Tricoci Hair*
*Salons & Day Spas, LLC d/b/a Tricoci Salon and Spa*