**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIO TRICOCI HAIR SALONS & DAY SPAS, LLC d/b/a Tricoci Salon and Spa, an Illinois corporation, | ) ) ) ) | Case No. 20-cv-07196 |
| Plaintiff, | ) ) | Honorable Matthew F. Kennelly |
| v. | ) ) | Hon. Mag. Gabriel A. Fuentes |
| CLAUDIA POCCIA and MOLLY SLOAT, | ) ) | |
| Defendant. | ) | |

**DEFENDANT MOLLY SLOAT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION**

NOW COMES Defendant, Molly Sloat, by and through her attorneys, Nielsen, Zehe & Antas, P.C., and for her Supplemental Brief in Opposition to Plaintiff's Amended Motion for Preliminary Injunction ("Motion"), states as follows:

### I. INTRODUCTION

In November 2020, Tricoci was told that Defendant Molly Sloat has not and will not disseminate Tricoci's confidential information. However, the truth could not prevent Tricoci from engaging in an unhinged and harassing legal crusade designed to punish Ms. Sloat for leaving the company after 18 months of employment. Seven months of "expedited discovery" performed at the insistence of Tricoci, including the production of tens of thousands of documents, extensive briefing and fact depositions reveal that Tricoci's allegations are patently false and based on circumstantial evidence arising from fictitious facts. These seven months further confirm what Ms. Sloat established in November 2020 – that she has not disseminated Tricoci's confidential information and that any information obtained by Sloat during her employment is without value.

1

Ms. Sloat sent Tricoci information to her personal email during her employment with the company for the benefit of Tricoci and none of the information was ever disseminated to a third-party. Yet Tricoci remains committed to an unprecedented and irrational position that Ms. Sloat should be barred from working for her current employer. For the reasons set forth below as well as the facts and arguments detailed in Sloat's Opposition to Plaintiff's Amended Motion for Preliminary Injunction (ECF Dkt. No. 93), Defendant Tricoci's Amended Motion for Preliminary Injunction should be denied.

## II. RELEVANT FACTS

### A. Tricoci's Habitual Practice of Racial and Sexual Disparagement Caused Sloat to Seek Alternate Employment Opportunities.

Tricoci asserts Sloat began collecting Tricoci information from the onset of her employment in March 2019, allegedly for the benefit of a third-party. It is further implied that Ms. Sloat resigned from her position with Tricoci in October 2020 for the purpose of sharing its information with her current employer Frédéric Fekkai. These allegations could not be further from the truth.

Ms. Sloat began seriously considering alternate employment opportunities when it became evident that the company's values did not align with her own. (Ex. 1, Supp Sloat Dec at ¶ 1). She further desired to leave a hostile work environment created by Tricoci CEO Chris Santiago. *Id*. From the onset of her employment, Mr. Santiago had a history of losing his temper, raising his voice and publicly degrading and demeaning employees within the organization. *Id.* at ¶ 2. He often publicly expressed his displeasure that the financial compensation of a female consultant, namely Claudia Poccia, was higher than his own. *Id.*

Mr. Santiago's questionable conduct was emphasized during an executive leadership call in April 2020. During the call, Mr. Santiago utilized an unknown filter to darken the pigment of his skin, add an afro, gold chains and dental grill as a comedic effort to depict a person of color. *Id.* at ¶ 3. Stunned that the CEO of a Chicago based salon servicing persons of color would engage in this type of behavior, Ms. Sloat took a picture of the image. *Id.* at ¶3; *see also* Ex. 2, photograph of Chris Santiago. When asked whether he ever posed in pictures mocking persons of color in a stereotypical way or had ever worn what is referred to as "blackface" in front of other employees, Mr. Santiago testified under oath that he had not. (Ex.3, Santiago Dep. at 25-28, 25:5-10: Q: Mr. Santiago, have you ever in your career worn blackface in front of other employees? A: No. Q: Have you ever posed in pictures mocking persons of color in a stereotypical way? A: No). Upon being presented with the photograph, Mr. Santiago finally admitted that he had utilized an unspecified and unknown Zoom filter to alter his appearance during the executive call but his memory failed to allow him to explain or justify his actions. (Ex. 4, Santiago Dep at 29-31; 30:18-31:1: Q: I just want to understand the context of this. Can you tell me what the purpose of this was and explain to me why it was appropriate? A: I don't know what meeting that was from. Q: You just don't recall? A: I don't recall. We played music on some of our calls. It could have been that. I don't recall this meeting).[1]

In approximately May 2020, a former Tricoci employee began a social media campaign to allow current and former Tricoci employees to address years of systemic racism within the organization. (Supp. Sloat Dec. at ¶ 4). Disappointed with Tricoci's refusal to issue a public statement or respond directly to the multiple allegations of inherent racism, Sloat sent a text to Claudia Poccia to express her displeasure following a June 1, 2020 meeting where the issue was

---

[1] Counsel for Tricoci also appeared concerned by Mr. Santiago's behavior as demonstrated by her inappropriate speaking objections and threats to call the Court during this line of questioning.

3

addressed. Specifically, Sloat stated, "I can't even put into words how awful this is. . . I'm just having a real conflict of heart here. I can't defend this. I can't defend them. I can't. . . I'm just morally ripped apart. And just sick over this." (Ex. 5, June 1, 2020 text message from Sloat to Poccia).

Sloat never disseminated Tricoci information nor did a third-party, including her future employer, ever request it. A graphic designer by trade, Ms. Sloat sought employers who valued her work ethic and integrity and her job search included multiple companies outside the hair care industry. *Id.* at ¶6. Her decision to leave Tricoci was not motivated by a desire to disseminate invaluable and stale Tricoci information to a future employer but rather to remove herself from a toxic work environment.

**B.     Sloat Forwarded Herself Tricoci Information to Work From Home for the Benefit of Tricoci and Never Disseminated this Information to a Third-party.**

Tricoci goes to great lengths to point out various documents Sloat forwarded to her personal email accounts while employed by the company. Sloat does not deny that she forwarded herself Tricoci documents to work on her home desktop computer *for the benefit of Tricoci*. Sloat also forwarded publicly available Tricoci documents such as photographs so that she could add them to her creative portfolio. (Ex. 6, Sloat deposition at 20:6-12; A: I would occasionally forward documents to myself for the purpose of accessing them from my home. Q: And for putting them in your creative portfolio, as you counsel indicated in this email, right? A: Yes, that's correct). At no time was Ms. Sloat informed or did she believe that sending herself Tricoci documents for the purpose of performing work from home was in violation of Tricoci company policy. (Ex. 7, Sloat deposition pp. 64-65; Q: Would you agree, Ms. Sloat, that sending yourself information from Tricoci e-mail address to your personal e-mail address constitutes removing it? A: No, that was not the way I understood it. I often performed work at home. I often sent things between e-mails.

And then with the onset of COVID, was regularly working from home and needed to work on a larger screen. And so in order to be able to do my duties, I made it as easy for myself to be able to do those duties as possible).

Plaintiff's alleged "smoking gun" consists of documents Ms. Sloat forwarded to herself on October 1, 2020, the day she notified Mr. Santiago that she was leaving Tricoci. Perhaps to Plaintiff's disappointment, Ms. Sloat forwarded herself these documents not for the purpose of disseminating them to a third-party but rather to prepare a transition report for Mr. Santiago prior her to departure. (Ex. 8, Sloat deposition pp: 73:16 – 74:13; 151:19- 155:22; Q: Did you send anything to your personal e-mail address from your Tricoci e-mail address in the last two weeks that you worked there? A: Yes. Q:What did you send to yourself? A: I sent myself a handful of files as I was preparing to create a transition report…So I did pull several files. I created spreadsheets of what my team did. I did an overview of what the e-mail calendar was, what the budgets were, and what the remainder of the marketing calendar was through the end of the year). Ms. Sloat again testified that none of this information was ever disseminated to a third-party. (Ex. 9, Sloat deposition 21:18 – 22:1; Q: In the fifth paragraph on that e-mail, you say that you will not disseminate Tricoci information. And then you say, quote, none of these documents have been shared. Do you see that? A: Correct. Q: Is that still true today? A: Yes, it is. Q: Did you share any Tricoci information with Ms. Poccia after she stopped working for Tricoci? A: I did not. Q: Anyone at Fekkai? A: No, never.

**C.      Tricoci has not Confirmed one Instance of Sloat Disseminating Tricoci Information.**

Although Plaintiff has the burden of proving its case, Tricoci's own CEO is unable to point to a single instance of dissemination of Tricoci information by Ms. Sloat. (Ex. 10, Santiago deposition, pp. 178-189, *see* pp. 186:19-189:9; Q: As you sit here today, Mr. Santiago, do you

have any evidence that Molly Sloat disseminated Tricoci confidential information to a third-party other than Ms. Poccia? A: Yes. Q: What evidence is that? A: Emails Q: Which emails? A: Emails that I have seen as part of this case. Q: And can you tell me what those are specifically? A: I don't have them in front of me). Plaintiff's Reply brief is equally vague as it fails to point to a specific instance of dissemination and blindly asserts, "the information Sloat forwarded to herself…are trade secrets." (ECF No. 121 at p. 12).

Equally startling is Plaintiff's inability to establish damages suffered by Tricoci as a result of Ms. Sloat's alleged conduct. When asked if Ms. Sloat's conduct caused damage, Mr. Santiago provided an incoherent response, ultimately conceding that he could not, after seven months of litigation, establish damages. (Ex. 10, Santiago deposition, pp. 189-191: Q: Mr. Santiago, are you contending that any dissemination of Tricoci confidential information by Molly Sloat has caused damage to Tricoci? A: Absolutely Q: And what damage is that? A: Okay, as we had talked about earlier in the testimony, there is a significant amount. In terms of having to redo strategy decks, look at our branding, knowing what we knew about product that was coming up, our branding guidelines, where we were going, what we are doing as a company, what markets we were going to enter. I can go on and on. Q: Do you have a dollar amount as to the amount of damage Ms. Sloat caused? A: We don't know right now).[2]

Mr. Santiago testified he spearheaded the effort to file a lawsuit against Ms. Sloat and Ms. Poccia. (Ex. 10, Santiago deposition, p. 186: Q: Who within the Tricoci organization initiated the lawsuit against Ms. Sloat and Ms. Poccia? A: The executive team. Q: And you are part of the executive team; is that correct? A: Yes, that's correct). His inability to specify what information

---

[2] Counsel for Sloat had approximately 10 minutes to question Mr. Santiago in light of the three-hour time limitation. Her questioning was repeatedly interrupted by inappropriate speaking objections by counsel for Tricoci who was motivated to run the clock to avoid obtaining unfavorable testimony from her client.

Sloat disseminated, to whom she disseminated it to, when the dissemination occurred and what damages resulted from the unspecified conduct begs the ubiquitous question: if not now, when?

Mr. Santiago's evasive testimony demonstrates this lawsuit was initiated for the purpose of harassing a valued employee who sought greener pastures. Despite Mr. Santiago's sworn declaration that Ms. Sloat's performance had declined for a period of at least 6 months prior to her departure (See ECF Dkt. 58, Ex. 1), he testified that her resignation was a detriment to Tricoci. (Ex. 10, Santiago deposition, pp. 183-185: Q: …And did you think that Ms. Sloat was failing to perform projects in a timely manner? A: Yes Q: And was her performance in general poor? A: Poor? Q: Yes. A: In what time-period? Q: Between April 2020 and October 2020. A: It was definitely going down. Q: Did you document any of this decline in performance or her inability to meet deadlines? A: No. Q: So, I would have imagined that you must have been so relieved that she was leaving, due to her poor performance, is that correct? A: Relieved that I am losing the vice-president of marketing, that I put everything into? That's a ridiculous statement).

Ms. Sloat's resignation from Tricoci undoubtedly struck a nerve with Mr. Santiago as he wasted no time filing a lawsuit immediately after her departure from the company. It is clear Mr. Santiago did not have proof of dissemination at the time he initiated lawsuit and has not been able to uncover a single document in support of Tricoci's position to date. Nor has Tricoci been able to proffer probative evidence of imminent and irreparable harm that any alleged dissemination (which did not occur) will cause. It is inconceivable that Plaintiff believes it is entitled to injunctive relief in the form of restricting Ms. Sloat's employment when it does not have evidence to support its claims.

## III. ARGUMENT

### A. The Remedy Sought by Tricoci is Overbroad.

Pursuant to the ITSA, a party seeking an injunction must prove both the existence of a trade secret and the misappropriation. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995). It is further established that the ITSA should not "prevent workers from pursuing their livelihoods when they leave their current positions." *Id.* (citing *American Can Co. v. Mansukhani,* 742 F.2d 314, 329 (7th Cir. 1984)). Further, an injunction must not "[p]revent a person from entering into an employment relationship," and any applied limitations must not be based "merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(i)(II).

Tricoci cannot point to one instance of dissemination but is seeking to enjoin Sloat from "directly or indirectly being involved, in any manner, in the management performance of work, or direction of any hair care product for Fekkai until December 2022." Alternatively, Tricoci seeks to enjoin Sloat from "directly or indirectly being involved, in any manner, in the relationship between Fekkai and ULTA until December 31, 2022." In other words, Tricoci is attempting to prohibit Sloat from working in her current position for 17 months or having any involvement with her employer's primary distribution partner. This request is prohibitively restrictive and directly contrary to Illinois law.

Tricoci's reliance on *PepsiCo* is further misplaced. In that instance, the Seventh Circuit enjoined the defendant from working for a direct competitor for six months before he began working for the company. *PepsiCo, Inc.*, 54 F.3d at 1267. It was also revealed that the defendant's knowledge from his former competitor's trade secrets and confidential information would necessarily influence his decisions for his work with Quaker. *Id.*

Sloat testified that she has not and will not disseminate confidential information. Plaintiff not only fails to allege that Sloat disseminated or intends to disseminate any Tricoci information, it fails to assert how any information obtained and subsequently deleted by Sloat would influence her work for Fekkai. Any inference that Sloat may have forwarded confidential information to Defendant Poccia further falls flat as Sloat testified that she never sent Tricoci information to Poccia after Poccia was terminated in March 2020. Triccoi has access to all emails sent by Sloat from Tricoci's server during her employment and thousands of emails sent by Sloat following her resignation from Tricoci, yet fails to cite to one Tricoci email or document that Sloat threated to disseminate or will inevitably disseminate nine months after she left the company. In sum, Tricoci seeks to prevent Sloat from working for her current employer because she forwarded herself Tricoci documents to her personal email while employed by Tricoci to perform work for the benefit of Tricoci. This is contrary to all precedent and defies all logic.

**B.     Sloat has not Disseminated Tricoci Information nor is There a Threat of Inevitable Disclosure.**

Under the inevitable disclosure theory, a plaintiff must prove there is intent by an employee to disseminate a trade secret or the dissemination of a trade secret is threatened or would be inevitable. *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734 (N.D. Ill. 2010). It is typically required that a plaintiff allege that the defendant "could not operate or function" in her new position without reliance on the trade secrets. *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1070 (N.D. Ill 2020). Courts examine three factors in an inevitable disclosure analysis: (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent the use or disclosure of the former employer's trade secrets. *Id.* The "mere fact that a person assumed a similar position at a competitor" is not enough to state a claim for inevitable disclosure.

9

*Id.* However, plaintiffs must allege more than "the mere fact that a person assumed a similar position at a competitor" to state a claim for inevitable disclosure. *Id.* Courts are aware that an overly broad application of the inevitable disclosure doctrine can inhibit an employee's interest in seeking employment with a competitor. *Triumph Packaging Group v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011).

In this instance, Sloat is not working for a direct competitor and any Tricoci information is worthless to Fekkai. Apparently Tricoci believes that any company remotely linked to hair care products, especially companies with an established retail line of products that Tricoci covets but does not have, is a competitor. However, the desire to become a competitor does not make it so. Importantly, it has not been alleged that Tricoci information would benefit Fekkai in any way. While Sloat assisted Tricoci with the rebranding of its product line, her creative current work for While Sloat assisted Tricoci with the rebranding of its product line, her creative current work for Fekkai consists of overseeing the existing design and the current creative work for e-mails, for the website, and digital ads. Sloat did not participate in the creative aspect of any Fekkai rebrand or current packaging as this was in existence well before she began working for the company. (Ex. 11, Sloat Dep. at 30-31).

As previously stated, no one from Fekkai has ever requested Tricoci information as it is useless to them. In fact, it would be detrimental to Sloat's career as a marketing professional to mimic creative work performed for a regional salon for an internationally renowned brand such as Fekkai.

### **CONCLUSION**

Allegations that Sloat stole, used and will continue to use Tricoci confidential and trade secret information for the benefit of Fekkai are unfounded, unsupported and disingenuous.

Plaintiff's failure to reference any evidence of dissemination of Tricoci information or a reason why dissemination would benefit Ms. Sloat or her current employer further proves Tricoci's desire to legally harass and financially punish a valued employee for pursuing a new position in her chosen field. For the foregoing reasons, Plaintiff's Amended Motion for Preliminary Injunction should be denied in its entirety.

Dated: July 12, 2021

Respectfully submitted,

NIELSEN, ZEHE & ANTAS, P.C.

By: */s/ Lindsay E. Dansdill*
Lindsay E. Dansdill, ARDC #6289316
NIELSEN, ZEHE & ANTAS, P.C.
55 W. Monroe Street, Suite 1800
Chicago, Illinois 60603
ldansdill@nzalaw.com
***Attorneys for Defendant, Molly Sloat***

## CERTIFICATE OF SERVICE

The undersigned attorney, being first duly sworn upon oath, depose, and say that I caused to be served the foregoing document by electronically filing the same with the Clerk for the U.S. District Court for the Northern District of Illinois, Eastern Division, a copy of which was then forwarded to each attorney of record by CM/ECF on July 12, 2021.

*/s/Lindsay E Dansdill*
Lindsay E. Dansdill, Esq.