IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARIO TRICOCI HAIR SALONS<br>& DAY SPAS, LLC,<br><br>      Plaintiff,<br><br>  vs.<br><br>MOLLY SLOAT and<br>CLAUDIA POCCIA,<br><br>      Defendants. | Case No. 20 C 7196 |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

      Plaintiff Mario Tricoci Hair Salons & Day Spas, LLC has moved for a preliminary injunction to bar defendants Claudia Poccia and Molly Sloat from working for Frederic Fekkai, or alternatively from any involvement in Fekkai's relationship with ULTA, a retail chain, for a six-month period; from soliciting Tricoci employees; from using Tricoci's confidential information; and to require them to return any information from Tricoci. Poccia and Sloat have agreed to entry of a preliminary injunction that includes the last three elements (with some variation), but they oppose the non-competition relief sought by Tricoci. The Court, with the parties' agreement, received evidence in the form of affidavits, deposition testimony, and documents. The Court also heard oral argument. This constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

**Facts**

Tricoci owns and operates a number of beauty salons and spas in the Chicago area. It also sells haircare and other products. During the time relevant to this case, Tricoci sold its haircare products at its salons and also via its website.

Federic Fekkai is also in the haircare business. It operates salons in New York City, but that does not appear to be the primary focus of its business. Rather, it focuses largely on selling "prestige" haircare products, which (at least currently) are sold through retail outlets like ULTA and Sephora. As best as the Court can make out, Fekkai is owned by a holding company called Blue Mistral, which appears to be a joint venture between Mr. Fekkai and a venture capital firm.

**1.    Poccia**

In 2018, Tricoci formulated a growth strategy to redevelop its products and place them in national retail distribution networks. To this end, it hired Poccia as a paid consultant, with an eye to making her an executive of the company. Poccia has extensive experience in the beauty industry, both in the corporate suite and as a consultant. In her counsel's words, she "specializes in reinvigorating brands and products to make them viable for broader distribution to target audiences." Def. Poccia's Opp. to Pl.'s Am. Mot. for Prelim. Inj. (dkt. no. 94) at 1.

Poccia signed a consulting agreement with Tricoci in February 2019. Poccia Affid., Ex. A (dkt. no. 94-2). It covered a six-month term and included an understanding that the parties would enter into an extension or replacement agreement and that if they did not, the existing agreement would continue on a month-to-month basis. Poccia was to serve as an independent contractor but would act as Tricoci's "interim president," and

the agreement stated that the parties had the "intention [for Poccia] to move into a permanent C-Suite role based on viability of effective impact on business and team . . . ." *Id.*, ECF p. 11 of 71.

Poccia's responsibilities under the agreement included product development, branding, and packing, retail, and merchandising. The agreement contemplated that Poccia would direct and work with a team at Tricoci to develop and implement a brand strategy to broaden the distribution of Tricoci-branded products. Tricoci agreed to pay Poccia a hefty salary—$30,000 per month plus expenses.

Poccia's agreement with Tricoci barred her, during the period she provided services to Tricoci, from directly or indirectly engaging in any competing business "anywhere in the Territory," defined as any city in which Tricoci had or was negotiating a lease. *Id.*, ECF p. 3 of 71. The agreement also barred her from soliciting any customer or client with which she had direct contact while providing services to Tricoci. In addition, the agreement barred Poccia from soliciting any Tricoci employee or representative for employment. It also required Poccia to maintain in confidence and not use for her own or another's benefit any "Confidential Information" of Tricoci, a broadly-defined term that essentially included any information regarding Tricoci, its products, its marketing, and its customers. *Id.*, ECF p. 4 of 71.

Upon execution of the agreement, Poccia immediately began working with Tricoci. Less than two weeks after she signed the agreement, Poccia sent Chris Santiago, Tricoci's chief executive officer, a document outlining a growth strategy. It included prioritizing personal care-oriented retail chains such as ULTA and Sephora. Poccia continued to work on developing the strategy—which involved upgrading

Tricoci's existing haircare product line and developing new brands for retail sale—throughout 2019 and into early 2020. Her work involved overseeing product development, formulas, pricing, and creative work relating to marketing.

On or about March 20, 2020, Tricoci advised Poccia that her contract would be terminated effective immediately due to the impact of pandemic-related restrictions on the company's revenue. Tricoci said it would pay Poccia only through the end of March. Poccia agreed to finalize some projects for Tricoci free of charge through the summer of 2020.

The Tricoci growth strategy had not been finalized and implemented by the end of March 2020, despite the fact that Poccia had been working for the company for a little over a year at that point. Poccia says this is due to, at least in part, the fact that the strategy required reformulation of Tricoci's products, which took time. Tricoci has suggested that at some point Poccia's efforts to implement the company's strategy slacked off due to the diversion of her focus to similar work for Fekkai. That is certainly one possible explanation, but the current record includes insufficient evidence to allow a finding on this point to be made one way or the other.

It appears that Tricoci did not actually approach ULTA until the fall of 2020. At that point, Tricoci's products were outside of ULTA's buying cycle, so the company rebuffed Tricoci's overture. On the record currently before the Court, the failure (at that point) of the hoped-for relationship cannot be laid at Poccia's feet. As best as one can determine, Tricoci's pause in its rebranding effort was caused by the pandemic, not Poccia's faithlessness.

**2.     Sloat**

4

Tricoci hired defendant Molly Sloat in early March 2019 as vice president of marketing. Her duties included responsibility for carrying out the rebranding strategy with the goal of placing Tricoci's products with national retailers. Sloat's employee agreement, *see* Pl.'s Am. Mem. of Law, Ex. 12 (dkt. no. 59-1), precluded her, during her employment with Tricoci, from working for any other entity that provided salon services geographically contiguous to those provided by Tricoci and from engaging in self-employment in competition with Tricoci. The agreement also precluded Sloat from, among other things, rendering services for a six-month period to any competitor, defined as any entity offering salon services with five miles of any Tricoci salon. *See id.*, ECF p. 68 of 534. The agreement also barred Sloat from disclosing, or using other than for her Tricoci employment, any confidential information, a term with a broad definition similar to the one in Poccia's agreement. *See id.*

3. **Poccia and Sloat's work for Fekkai**

The evidence reflects that in or about March 2019, less than a month after Poccia signed her consulting agreement with Tricoci, she began to consult with Blue Mistral, which as best as the Court can determine is a joint venture that owns Fekkai and other Fekkai-named entities that operate salons in New York City and market haircare and other products through national retailers. Poccia's work for Fekkai, like her work for Tricoci, involved developing a branding and retail strategy for its products, including marketing the company's products through national retailers, including ULTA. This overlapped with the work Poccia was doing in connection with Tricoci's intended rebranding. Poccia ultimately became Blue Mistral's chief executive officer.

In June 2019, Poccia began to recruit Sloat to work for Blue Mistral/Fekkai.

These efforts continued through the summer and fall of 2019—while Poccia was unquestionably still under contract with Tricoci—and into 2020. Sloat started working for Fekkai in August 2020, while still employed by Tricoci. Her job at Fekkai involved work similar to what she had been (and was still ostensibly) doing for Tricoci.

Both Poccia and Sloat (for a much shorter period) performed significant work for or for the benefit of Fekkai while still working for Tricoci—and without telling Tricoci that they were doing so. This was despite the fact that their work for Fekkai overlapped with their work for Tricoci. Specifically, their work for both companies involved marketing the companies' haircare products and placement of those products with national retailers.

When Poccia and Sloat started working for Tricoci, Tricoci was not competing head to head with Fekkai except in a limited way: Tricoci's sales of its products from its salons and via its website competed to some limited extent with Fekkai's nationwide retail sales. But the whole point of Tricoci's hiring of Poccia, and later Sloat, was to develop and execute a strategy to compete directly, not just with Fekkai, but with companies—including Fekkai—that sell "prestige" haircare products at retail stores. Fekkai was already in that market when Poccia, and later Sloat, began to work for Tricoci, and Tricoci's plan in hiring Poccia and Sloat was to compete in that same market.

As such, Poccia's work for Tricoci was in "direct conflict" with her work for Fekkai—as Poccia admitted in writing in April 2019 when she was either pitching or being pitched by Fekkai. *See* Pl.'s Resp. to Poccia's Mot. for Prelim. Inj. (dkt. no. 118), Ex. 6. Specifically, she did work with a similar focus for both entities at the same time.

Poccia performed this overlapping work for or for the benefit of Fekkai for a significant part of the period she was being paid by Tricoci. She never let Tricoci in on the conflict.

Though Poccia seems to contend at various points that she was not performing Fekkai-related work until sometime in 2020, the evidence appears to show that she was doing so considerably earlier than that. There may be a question as to exactly whose hat Poccia was wearing when (Poccia says she was pursuing activities relating to an idea for an incubator entity for beauty products), but the evidence, as the Court sees it, appears to show that she was participating in meetings with persons affiliated with Fekkai, conducting Fekkai-related work, in the summer and fall of 2019, and into early 2020.

In May 2019, Poccia sent to Joanna Coles—an executive with a private equity firm that is a joint venturer in Blue Mistral, which owns Fekkai—a copy of a presentation she had prepared for Tricoci in March 2019. The presentation discussed, among other things, market trends and where Tricoci might have opportunities in the market for "prestige beauty" products. A good deal of the presentation was based on market-related data, the provenance of which is somewhat disputed: Tricoci contends it paid for the data; Poccia says she did. The presentation also set out Poccia's ideas for expanding Tricoci's product distribution, though, to be sure, these were preliminary and relatively general thoughts, not specific marketing proposals. *See* Pl.'s Am. Mem. in Support of Am. Mot. for Prelim. Inj., Ex. 17 (dkt. no. 59-1, starting at ECF p. 92 of 534). Poccia says that she sent this to Coles, a friend and business partner, as an example for a pitch document, not for any competitive purpose.

The evidence also reflects that perhaps in 2019 and definitely in the early part of

7

2020, Poccia was working on behalf of both Tricoci and Fekkai simultaneously to develop relationships with ULTA, which as indicated earlier is a major national retail chain. Specifically, that was one of Tricoci's key goals, and Poccia told Tricoci that she was working to get its products into ULTA. But during the same period, Poccia met with ULTA representatives on behalf of Fekkai, which was pitching similar types of products. Poccia did not disclose these Fekkai-related activities to Tricoci, even though she had earlier disclosed potentially conflicting engagements with entities other than Fekkai. Conversely, it appears that Fekkai was fully aware of Poccia's work for Tricoci.

In late February 2020, shortly before attending a meeting in (or near) Chicago relating to placement of Fekkai's products with ULTA, Poccia sent to an executive with one of Fekkai's owners a copy of a Tricoci strategy summary, along with a suggestion that Fekkai should take a similar approach. The summary, however, was quite general, and it's not clear that it included any information that can fairly be considered to have been confidential information of Tricoci within the meaning of the relevant statutes. *See* Pl.'s Resp. to Poccia's Mot. for Entry of Prelim. Inj. (dkt. no. 118), Ex. 4.

After attending the meeting with the Fekkai representatives, Poccia sent one of them an e-mail expressing hope for an "opportunity to create a ULTA/FEKKAI movement in clean, salon haircare." *Id.*, Ex. 5. Again, this was during the period when Tricoci was paying Poccia a handsome salary, in significant part to get *its* products into ULTA.

In early May 2020, after the termination of her contract with Tricoci, Poccia sent an e-mail to a Fekkai-affiliated executive regarding pricing, stating that it "is a bit off overall; I am going to check my work for Tricoci." *Id.*, Ex. 7.

As indicated earlier, Poccia first suggested to Sloat and Fekkai in 2019 that Sloat should be working for Fekkai. By at least as early as June 2020, Poccia was more seriously pitching Sloat to work for Fekkai. Sloat provided samples of her work for Tricoci to Poccia to be given to Fekkai, and Poccia told Fekkai executives that Sloat "knows ULTA inside & out . .. and could definitely get us set up for access @ ULTA on all brands in the portfolio." *See* Pl.'s Am. Mem. in Support of Am. Mot. for Prelim. Inj., Ex. 44 (dkt. no. 59-1, starting at ECF p. 239 of 534).

As indicated earlier, Sloat being working for Fekkai in August 2020, while still employed by Tricoci. Like Poccia, her work for Fekkai was the same type of work she was doing for Tricoci. Specifically, by mid-September 2020, Sloat was working on a website redesign and product packaging for Fekkai—which she also was doing or had done for Tricoci. Sloat did this work while still being paid by Tricoci, all the way through mid-October 2020.

On October 2, 2020, Sloat gave Tricoci two weeks' notice that she would be leaving the company, saying that she would be doing back to consulting. By this point, as indicated, she had already been working for Fekkai for close to two months—a fact she did not disclose to Tricoci. On October 1, the day before giving notice, Sloat sent herself a series of e-mails with Tricoci-related information, including proposed initiatives for the upcoming months, marketing plans, financial information relating to marketing, draft operational plans, and other marketing-related information. Sloat said she did this in order to prepare a transition memo for Tricoci's use upon her departure.

## Discussion

Tricoci has moved for entry of a preliminary injunction. As indicated earlier, the

9

disputed aspect of Tricoci's motion involves its request to bar Poccia and Sloat from working for Fekkai or affiliated entities, or at least on Fekkai's dealings with ULTA, for a six month period.

To obtain a preliminary injunction, a party must show it will suffer irreparable harm; "traditional legal remedies would be inadequate" to remedy this harm; and it has a reasonable likelihood of success on the merits. *See, e.g., Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If the party makes this showing, the court weighs the harm the plaintiff will suffer if an injunction is denied against the harm the defendant will suffer if one is granted. *Life Spine, Inc*, 8 F.4th at 529. This balancing is done on a sliding scale: the greater the plaintiff's likelihood of success, the less the balance of harms has to tilt in the plaintiff's favor. *Id.* When balancing the harms, the court also considers the public interest. *Id.*

In its amended complaint, Tricoci asserts the following claims. Count 1 is a claim against Poccia for breach of the confidentiality provision of her consulting agreement. Count 2 is a claim against Sloat for breach of the confidentiality provision of her employment agreement. Count 3 is a claim against Poccia for intentional interference with Tricoci's contract with Sloat. Count 4 is a claim of unjust enrichment against both defendants. Count 5 is a claim against Sloat for breach of fiduciary duty. Count 6 is a claim against Poccia for aiding and abetting Sloat's breach of fiduciary duty. Count 7 is a breach of fiduciary duty claim against Poccia. Count 8 is a claim of civil conspiracy. Counts 9 and 10 are claims of negligent spoliation. Counts 11 and 12 are claims against both defendants for violation of, respectively, the Illinois Trade Secrets Act and

the Defend Trade Secrets Act. Count 13 is a claim against Sloat for violation of the Computer Fraud and Abuse Act. Count 14 is a "claim" for a preliminary and permanent injunction; it is not really a separate claim for relief.

Tricoci does not assert in its amended complaint a claim for breach of the non-compete provisions in either Poccia's or Sloat's contracts. This is likely due to the wording of those prohibitions, which are tied to locations where Tricoci has a lease (for Poccia) or provides salon services (for Sloat), in other words, places where Tricoci has a brick-and-mortar store. To put it another way, the non-compete provisions are not terribly broad in their scope.

In its post-hearing reply, Tricoci appears to contend that Poccia breached the non-compete term of her consulting agreement by working for Fekkai. That's too late to assert this as a basis for a preliminary injunction. That aside, the evidence currently before the Court to support this contention is no better than equivocal. Specifically, there is evidence indicating that in March 2020, while still working for Tricoci, Poccia participated in meetings with Fekkai representatives in Chicago (though Poccia says it was in a suburb) to prepare for a meeting with ULTA—also in Chicago—to discuss Fekkai's products. Chicago is within what the Tricoci-Poccia agreement defines as Tricoci's "territory," and thus Poccia was precluded, while working for Tricoci (as she was at the time), from engaging in a competing business in Chicago. ULTA was one of the key retailers that Tricoci understood Poccia to be targeting for its products, so this involved "competing business" to that extent. But it is less than clear that Poccia's simple attendance at meetings in Chicago amounts to "engaging in [a] competing business" here within the meaning of her contract, and Tricoci does not offer anything

11

approaching a point-by-point explanation of its non-compete breach theory. The Court concludes that, at least on the current record, Tricoci has not shown a reasonable likelihood of success on its not-yet-pleaded claim for Poccia's breach of the non-compete provision of her agreement—even if such a claim were properly before the Court.

Tricoci's preliminary injunction motion is otherwise premised on its claim that Poccia and Sloat have breached or will breach the confidentiality terms of their agreements, which runs parallel to Tricoci's claims under the ITSA and the DTSA. Tricoci relies on the "inevitable disclosure" theory that was first discussed in *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995). In that case, Redmond, a high-level employee of PepsiCo went to work for Quaker, a direct competitor. Redmond did not have a non-compete agreement with PepsiCo but did have an agreement barring him from disclosing or using "confidential information relating to the business of PepsiCo." *Id.* at 1264. The court of appeals affirmed the issuance of a preliminary injunction under the Illinois Trade Secrets Act that barred Redmond not just from using PepsiCo information, but "from assuming his position at Quaker" for a six-month period. This was predicated on PepsiCo having "demonstrate[ed] that [Redmond's] new employment [would] inevitably lead him to rely on [PepsiCo's] trade secrets." *Id.* at 1269. It emphasized that Redmond "possessed extensive and intimate knowledge about [PepsiCo's] strategic goals" for the upcoming year in the area in which it directly competed with Quaker, and that Redmond's actions "demonstrated a lack of candor on [his] part and proof of [his] willingness to misuse [PepsiCo] trade secrets . . . ." *Id.* at

1269, 1270.  This was not simply a case, the court said, of a "skilled employee[ ] . . . taking [his] skills elsewhere."  *Id.*

The Illinois courts have adopted *PepsiCo v. Redmond* as accurately describing Illinois law regarding injunctions based on a claim of inevitable disclosure of trade secrets.  *See, e.g., Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1070, 740 N.E.2d 1166, 1178 (2000).  As stated in *Strata*, the plaintiff must show that the defendant "could not operate or function [in her new position] without relying on [the plaintiff's] trade secrets."  *Id.* at 1071, 740 N.E.2d at 1179.  *See also, e.g., Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1070 (N.D. Ill. 2020).  An employer's fear that its employee will use the trade secrets is not enough.  *Saban v. Caremark RX, LLC*, 780 F. Supp. 3d 700, 734 (N.D. Ill. 2011)

The defendants seem to contend that *PepsiCo* doesn't really apply here because Tricoci and Fekkai weren't and aren't competitors.  It's true that the two companies were not direct, head-to-head competitors in the way that PepsiCo and Quaker were.  But that doesn't take the inevitable disclosure claim off the table.  Even before Tricoci hired Poccia and Sloat, the two companies were competing to a limited extent in that they both sold haircare products, albeit mainly through different channels of commerce.  And as Tricoci points out, at all relevant times Tricoci was selling its products at its "flagship" salon on North Michigan Avenue in Chicago, and Fekkai was selling its products just down the street at ULTA's flagship store, less than a mile away.

That aside, however, the entire purpose of Tricoci's hiring of Poccia and Sloat was to develop and implement a strategy that, if carried out, would have resulted in head-to-head competition with Fekkai.  Poccia herself recognized as much when she

wrote that her proposed work for Fekkai represented a "direct conflict" with her work for Tricoci.  Because the goal of Tricoci's hiring of the defendants was to engage in direct competition with Fekkai (among other haircare product sellers), there is no viable argument that the inevitable disclosure doctrine does not apply.

On the other hand, the reality that Tricoci was not yet directly competing with Fekkai's product sales in any significant way is appropriately taken into account in application of the inevitable disclosure doctrine to the facts of this case.  This is not a case like *PepsiCo*, where any information about its plans and strategies would have redounded to the benefit of its key competitor Quaker.  Tricoci was working toward gaining a foothold in the prestige haircare products market; Fekkai already had one (at least that's what the record reflects at this point).

On to the merits of Tricoci's inevitable disclosure claim.  First, Tricoci contends that the defendants *already have* used Tricoci's confidential information in their work for Fekkai.  The Court does not believe that Tricoci has made this showing (or shown a reasonable likelihood of success) with regard to Sloat.  Sloat's transmission of a good deal of Tricoci information to herself the day before she notified Tricoci that she was resigning is, to be sure, highly suspicious.  But Sloat has offered a reasonable, exculpatory explanation for this that Tricoci has not adequately rebutted at this point. Based on the current record, there is no basis for a reasonable inference that Sloat actually disseminated any of this information to Fekkai or anyone else or that she used it in her work for Fekkai.  Perhaps just as importantly, Tricoci has not done much to try to explain exactly how the information Sloat sent herself in fact would qualify as protectable trade secrets or, just as significantly, how it would be valuable to Fekkai

14

going forward. There is evidence that Sloat, apparently at the behest of Fekkai's chief marketing officer, actually used Tricoci's website as an inspiration in redesigning Fekkai's website. But one cannot fairly consider Tricoci's website design to be a trade secret or proprietary, as it is publicly available.

As for Poccia, the evidence reflects that she did transmit some Tricoci information to Fekkai representatives. Tricoci has not, however, shown this to have been trade secret or otherwise protected information *of Tricoci* that would be of value to Fekkai. The slide presentations that Poccia sent discuss strategy, but at a rather high level of generality. And to the extent they contain market-related information about other entities, it appears that was information obtained from a third party. Even if one assumes for present purposes that Tricoci paid for this information or that Poccia acquired it for Tricoci, it's hard to see how this would qualify the information as a Tricoci trade secret. On the present record, Tricoci has not persuasively shown that the information Poccia actually transmitted was particularly significant or consequential.

Tricoci also contends that the defendants' work gave them access to confidential information about Tricoci's pricing and strategies and that this would be valuable information in the hands of a competitor or even a prospective competitor. As Tricoci puts it, Poccia became privy to Tricoci's "costs to produce, market, and sell [its] products, thereby providing a roadmap to the margins required for profitability and success of certain products over others (a key reason Fekkai hired her to run its haircare product line) and viability in negotiating with national retailers." Pl.'s Reply (dkt. no. 136) at 3. But Tricoci was not and is not yet an *actual* competitor of Fekkai in the "prestige" retail market. For that reason, it is difficult to see, and Tricoci has not

persuasively shown at this juncture, that any Tricoci-protectible information that the defendants obtained from Tricoci would be of any significant value to Fekkai given their disparate postures vis-à-vis the relevant market in which Tricoci intended to compete.

Tricoci also argues that the Court should draw an adverse inference against the defendants, particularly Poccia, from their destruction (and perhaps from their delayed production) of documents and ESI, including Tricoci-related material. The Court does not have a sufficient basis to do that at this juncture. First, the circumstances of any claimed destruction are at best murky at this point, as Tricoci appears to have initially told the defendants to destroy any Tricoci-related material before reversing course and telling them to preserve it. And second, any production delays or inappropriate withholding of requested material is better dealt with, at least initially, by compelling its production rather than by drawing an adverse inference from its withholding.

In sum, the Court concludes that Tricoci has not shown a reasonable likelihood of success on its inevitable disclosure claim, let alone any irreparable injury from the feared use, for Fekkai or others, of protectible trade secrets belonging to Tricoci. On the present record, this is not a case in which the defendants "could not operate or function" in their positions with Fekkai without relying on Tricoci's trade secrets.

There is plenty of evidence in the case of faithlessness and double-dealing on the part of Poccia and, perhaps to a lesser extent, Sloat. They were trying to wear two hats at the same time while concealing this from Tricoci. For this reason, Tricoci's most viable claims against Poccia and Sloat, at least on the face of it, may well be its claims against both defendants for breach of a duty of loyalty and unjust enrichment and against Poccia for interference with Sloat's employment contract. But those are not the

sorts of claims that can get Tricoci a preliminary injunction at this point, as they don't involve any current or future harm, at least not that Tricoci has shown.

On the record before the Court, Tricoci has failed to make the case for application of the inevitable disclosure doctrine or that it has suffered, or risks, an irreparable injury for which it lacks an adequate remedy at law. For this reason, Tricoci is not entitled to the non-competition injunction that it seeks. It is, however, entitled to an injunction along the lines of what Poccia and Sloat have signaled they agree: (1) barring them from using, disclosing, misappropriate, relying on, copying, or transferring Tricoci's information in their possession, custody, or control; (2) (a) requiring them to return, in no less than twenty-one days after entry of a preliminary injunction, any and all Tricoci information that is within their possession, custody, or control; or alternatively (b) destroying any and all Tricoci information that is within their possession, custody, or control pursuant to a protocol to be agreed upon within ten days after entry of a preliminary injunction; and (3) barring them from directly soliciting, inducing, or attempting to solicit or induce any Tricoci employee to leave the employment of Tricoci. Tricoci's motion is granted only to that extent.

## Conclusion

For the reasons stated above, the Court grants plaintiff's amend med motion for a preliminary injunction [dkt. no. 58], but only to the limited extent stated in the body of this opinion, and denies as moot the defendants' motions for a preliminary injunction [dkt. nos. 113 & 116]. The parties are to confer promptly and are to provide to the Court's proposed order e-mail address, by no later than 12:00 noon on October 13, 2021, a draft preliminary injunction order that conforms to the Court's ruling. The case

is set for a telephonic status hearing on October 15, 2021 at 9:25 a.m., using call-in number 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves.

Date: October 8, 2021

_____
MATTHEW F. KENNELLY
United States District Judge